The statute relating to the appointment of inspectors of election in the city of Albany provided that one set of inspectors of election should be selected by the minority member of a board consisting of the mayor of the city, the president of its common council and one other member selected by those members of the common council of different political faith and opinions on State issues from those of the mayor; the mayor and the president of the common council were of the same political party, but upon all important questions before the commission the vote of the mayor was opposed to the votes of the two other members of the commission.

*Held*, that such mayor was the minority member of the board, and as such was entitled to appoint one set of such inspectors of election.

APPEAL by James H. Manning, as mayor of the city of Albany, from an order made at a Special Term of the Supreme Court, entered in the office of the clerk of the county of Albany on the 7th day of March, 1893, directing that a peremptory mandamus issue, commanding the appellant to cause to be published certain lists of inspectors and poll clerks.

*John A. Delehanty*, for the appellant.

*Edwin Countryman* and *Andrew Hamilton*, for the respondent.

HERRICK, J.:

In the city of Albany, election officers are appointed by a board of election commissioners, pursuant to section 15, chapter 171 of the Laws of 1892; that portion of it pertinent to this inquiry reads as follows: " All inspectors of election, poll clerks and ballot clerks in the city of Albany shall hereafter be selected and appointed by a board of election commissioners, which shall be composed of three members, consisting of the mayor, the president of the common council and a third member to be selected by those members of the common council of different political faith and opinions on *State issues* from those of the said mayor, which shall also have power to fill all vacancies which may, from any cause, arise ; but if, from any cause whatever, the said board of election commissioners should fail to fill such vacancy, or if such vacancy should occur on the day of election, the chief of police of said city is hereby empowered and directed on his own motion to fill such vacancy. It shall be the duty of said board of election commissioners, at least thirty days before any election, for each election district in said city, to select to serve as inspectors of election three persons (two of whom on *local* issues, shall be of different political faith and opinions from their associates, and of the same political faith and opinions as the majority of the electors in said district, as determined by the official canvass of the votes cast by said electors for the different candidates for mayor at the previous charter election), who shall be citizens of the United States and of the State of New York, of good character and able to read and write the English language understandingly, qualified voters in the city of Albany, residents of the election district for which they are appointed, and not candidates for any office

to be voted for by the electors of the district for which they shall be selected. The inspectors of election so selected for the city of Albany to represent the party of the same political faith as the minority member of said board, shall be selected solely by such minority member. Immediately after and within twenty-four hours from the time such persons are so selected, the mayor of said city shall cause the names of the persons so selected for inspectors and for poll clerks, as hereinafter provided, stating opposite to each name, the residence of such person, his occupation and the district in which he is to serve, to be published three times consecutively in each of the official city newspapers, which official publication shall be deemed a good and sufficient notice." Subsequent sections of the act provide for the appointment of poll clerks and ballot clerks in a similar manner.

In the spring of 1892, James H. Manning was elected mayor of the city of Albany, upon the Democratic ticket, Charles H. Armatage was elected president of the common council by the Democratic members thereof, and during the same year, Clifford D. Gregory was selected the third member of the board of election commissioners by the Republican members of the common council of said city. This board so constituted, with the mayor acting as chairman or president thereof, designated the election officers for the election held in the fall of 1892.

On the 3d day of March, 1893, Charles H. Armatage and Clifford D. Gregory, as commissioners of the board of elections, signed and issued a notice or call for a meeting of such board to be held upon the 4th day of March, 1893, for the appointment of election officers to serve at the then coming spring election, which call or notice was served upon Mr. Manning.

The members of the board met pursuant to such notice, and upon motion of Mr. Gregory and by the vote of Mr. Gregory and Mr. Armatage, Mr. Armatage was elected chairman. The board then proceeded to designate election officers.

It appears that since the last mayoralty election and before election officers had last been selected by the board, the boundaries of nearly all the election districts in the city of Albany had been changed.

From the minutes of the proceedings of said board, it appears that many motions and resolutions were offered, and carried or lost,

and that upon all these motions except two, one that all votes taken upon questions be taken by ayes and noes, and another a motion by Mr. Manning that his designation of inspectors of election be spread upon the minutes, which two motions were adopted unanimously, Mr. Gregory and Mr. Armatage voted together, and Mr. Manning voted alone.

Mr. Manning offered a resolution that the persons whose names were on the list attached to such resolution be selected and appointed to serve as inspectors of election to represent the Democratic party. The resolution also recited that it had been already determined by this board, at its last regular meeting, that in each of said districts where two persons were named said persons so named were of the same political faith and opinions as the majority of the electors in said several districts respectively, to wit, members of the Democratic party.

This resolution, it will be observed, was substantially a determination by the board of the number of inspectors of election allotted to the different parties in the several election districts in the city, and also a designation of the persons to serve in those districts, on behalf of the Democratic party. This resolution was beaten, Messrs. Armatage and Gregory voting against it, and Mr. Manning for it.

Mr. Armatage then offered a resolution designating as inspectors of election in the several election districts in the city, two in some and one in others, which he claimed to be the Democratic list; the resolution was adopted by the vote of Messrs. Armatage and Gregory, and Mr. Manning voting against it.

Mr. Manning raised a question that the allotment of the inspectors of election in the several districts was not in accordance with the law; that where two were designated they were not of the same political faith and opinions as the majority of the electors of the several districts for which they were named, as determined by the vote cast for mayor at the last preceding charter election. His objection was overruled, and upon appeal, the decision of the chair overruling, his objection was sustained by the vote of Messrs. Armatage and Gregory.

The effect of the adoption of this resolution was of course a determination of the districts in which the Democrats were to have two inspectors of election and the Republicans one, and *vice versa*.

Mr. Manning then, claiming to be the minority member of the

board, presented a paper in which he declared that he selected the persons named therein to serve as the Democratic inspectors of election in the several election districts, which list appears to apportion the inspectors in the several election districts in the proportion determined by the last preceding resolution.

Mr. Gregory then offered a resolution that the persons whose names were subjoined to it be appointed and selected as Republican inspectors of election, which resolution was adopted by the votes of Messrs. Armatage and Gregory, Mr. Manning declining to vote on the ground that as a minority member he had no right to vote for Republican election officers. The names on the lists presented by Messrs. Manning and Armatage are with a very few exceptions dissimilar.

The Manning list, as originally presented, gave the Democrats the majority in the same number of districts as were awarded to the Democrats at the last preceding selection of election officers by the board; the Armatage resolution gave them the majority in a lesser number of districts, and increased the number of Republican election officers to a corresponding extent.

It appears in the case that ever since election officers have been appointed in the city of Albany, it has been the custom of the Democratic general committee of the city of Albany to prepare and present to the appointing power a list of the names of persons to be appointed as the Democratic election officers, and that such persons have always been appointed, and it was so done by the present board when it designated election officers for the fall election of 1892.

That such a list was prepared and presented by said committee at this time, and that the list designated by Mr. Manning contains the names of the persons upon such list.

Messrs. Gregory and Armatage claimed that the respective lists for which they had voted, and only those, contained the names of the election officers designated by the board, and that the names so selected were the ones to be published, pursuant to the statute, and sworn in as such election officers.

It being the duty of the mayor to publish the list of names selected by the board, Mr. Manning proceeded to publish as the Republican list of inspectors of election, the names in the list con-

tained in the resolution offered by Mr. Gregory, and voted for and declared carried by the votes of Messrs. Armatage and Gregory, and as the Democratic list the names contained in the list presented by himself, and claimed to have been designated by him as the minority member of such board, and omitted and refused to publish as Democratic election officers, the names of those contained in the resolution offered by Mr. Armatage, and declared carried by the votes of Messrs. Armatage and Gregory.

Mr. Armatage applied for a mandamus to compel Mr. Manning, as mayor of the city of Albany, to publish the list of election officers appointed by the board, contending that the names included in the two lists offered and voted for by Mr. Gregory and himself were the ones and the only ones legally selected by said board for that election.

An order to show cause why a writ of peremptory mandamus should not issue was made returnable at a Special Term to be held at Chambers, at four o'clock in the afternoon of the same day on which the order to show cause was granted. A peremptory writ of mandamus was granted at such Special Term held at Chambers, directing Mr. Manning, as mayor, to publish such list of election inspectors, poll clerks and ballot clerks as was presented by and upon motion of Mr. Charles H. Armatage; an appeal was taken from the order granting such writ to this court, and a stay of proceedings was granted pending the hearing and determination of such appeal. Upon the return of the order to show cause, objection was taken that a Special Term held at Chambers had no jurisdiction or authority to issue a writ of mandamus; this objection was overruled, and in this, we think, the learned justice erred.

The order to show cause was made returnable to a Special Term to be held at Chambers; the order that the peremptory writ issue is entitled as having been made at Chambers. A peremptory mandamus cannot be granted at Chambers. (*The People ex rel. Lower* v. *Donovan*, 135 N. Y. 82; *Matter of Wadley*, 29 Hun, 12.)

. While this is sufficient perhaps to dispose of this appeal, yet, as the other questions presented are ones that are liable to arise from time to time under the peculiar election law of the city of Albany, it is perhaps well to consider also the merits of the case.

It will be seen that the real question involved is, who is the

minority member of the board of election commissioners, and who, as such, has the right to designate the election officers to represent the party of the same political faith as himself? This presents an interesting question, and one not altogether easy of solution.

The rule is well settled that statutes should receive a sensible construction, such as will carry into effect the Legislature's intention, and avoid unjust and absurd conclusions. (*Church of the Holy Trinity* v. *United States*, 143 U. S. 457; *People ex rel. Wood* v. *Lacombe*, 99 N. Y. 43.)

The intention and spirit of the law must be sought, and must, if possible, be given full force and effect. Prior, contemporaneous or even subsequent legislation upon the same subject, or in anywise relating thereto, may be resorted to as aids to the proper interpretation of a statute.

The substance of the law relating to the appointment of election officers in and for the city of Albany first appeared in chapter 298 of the Laws of 1883, title 21, which provided that such election officers should be selected and appointed by the board of police commissioners of said city, and further provided that "The inspectors so selected for the city of Albany to represent the party of the same political faith as the members of the police · board in the minority shall be selected solely by the minority members of said police board." This provision, it will be seen, is almost identical with that contained in the act of 1892, as above cited.

At the time of the passage of the act of 1883, and until the passage of chapter 99 of the Laws of 1892, the board of· police commissioners of the city of Albany was composed of the mayor of said city and four police commissioners elected as such; these commissioners were all elected at the same time; an elector could only vote for two of them, the intention being that each of the dominant parties should elect two members of such board. The mayor was elected to· serve for a term of two years; police commissioners were elected to serve for four years. The result of this might be, and sometimes was, that the police commissioners, who were the minority members during two years of their term of office, were a part of the majority during the other two years.

By chapter 99 of the Laws of 1892, the law providing for the election of police commissioners for the city of Albany was repealed,

and it was provided that thereafter police commissioners should be appointed by the mayor in the manner designated in such statute. The act contained no restrictions upon the mayor as to the political faith of the persons appointed police commissioners.

It was evident by this and other acts relating to the city of Albany, passed at the same session of the Legislature, that it was intended to do away, as far as possible, with so-called non-partisan boards of commissioners.

It is apparent that, under chapter 99, a police commission could, and probably would, be appointed, composed entirely of persons of the same political faith, and then we would have a commission of one party selecting election officers to represent all parties; to avoid so evident an abuse, chapter 99 was followed up by chapter 171 first referred to. It is then perfectly apparent that the intention of the Legislature was to have election officers in the several election districts of different political faith; to have men appointed who, politically, would have nothing in common except the desire to guard and protect the interests of the party they represented from invasion by the other; to have men selected who would not act in harmony with each other; but who would be in a condition of watchfulness and hostility to each other, so that the electors of the several parties would have guards, watchers and protectors, and each party being guarded and protected in its rights from invasion by the other, all would be protected and an honest election secured; and as the means of carrying this out, it was the evident intention that the representatives of one party should not select the election officers for the other party, but that such selection should be made by persons in political antagonism to each other.

Bearing in mind this intention and evident spirit of the law, let us see if it can be so interpreted as to carry into effect that spirit and intention.

The law provides for the selection of three inspectors of election, "two of whom on *local issues* shall be of different political faith and opinions from their associates." It then provides that the inspectors of election of the same political faith as the minority member of said board shall be selected solely by him. It is obvious then, that when he has made his designation or selection of inspectors that their status is fixed, and it then becomes the duty of the majority members of

the board to designate for the remaining inspectors of election persons of the opposite political faith to those designated by the minority member.

The wording of the last-cited provision of the act is peculiar. It is not a provision that the representatives of each party in the board shall designate the election officers for that party, neither is it a provision that the members of the board shall select the election officers who are of the same political faith as themselves. "The inspectors of election so selected for the city of Albany to represent the party of the same political faith as the minority member of said board shall be selected solely by such minority member." (Laws of 1892, chap. 171, § 15.) There may be other members of the board of the same faith as the minority member

It recognizes the fact also, that there may be divisions on local issues; divisions that we all know are sometimes more absorbing for the time being than those on State issues, and while in the selection of the third member of the board it requires such selection to be made by those of opposite political faith *on State issues* to that of the mayor, yet, when it comes to the selection of the inspectors of election, the requirement is that two of them shall be of different political faith and opinions from their associates, not on State but on *local* issues.

It is common knowledge that in municipal elections persons of opposite political faith on State and National issues have combined together on local issues, and bargained away the interests of their parties on State or National issues to subserve their local interests. Under this provision of the law, as we understand it, no such combination can be made. A careful reading and consideration of the provisions of the statute last cited make their purpose apparent.

As we have seen, the general spirit and intention of the law is to secure the appointment of inspectors of election antagonistic to each other, and that the representative of one party shall not select the inspectors for the other party; and so far as the division of the inspectors is concerned the test is their antagonism on local issues, and those portions of the statute last referred to are intended to insure the carrying of such intention into effect by compelling the appointment of those of the same political faith as the minority member, giving him absolute protection against the majority mem-

bers of the board in his selection of members of his own party faith, and preventing any combination between two members of the board to select all the election officers; for when such a combination is formed, the one who is combined against becomes the minority member, and thus entitled to designate a list of inspectors himself, thereby defeating the object of the combination, all that is left for those who have combined together to do, being to appoint, as the remaining election officers, persons of an opposite political faith to those designated by the minority member, thus forcing them to carry out the spirit and intention of the statute, which possibly they may have combined together to thwart and defeat.

Who is the minority member?

It must be apparent, I think, by a very brief consideration of the matter, that the status of parties does not determine whether a member of this board is a majority or a minority member; the Republicans may elect the mayor and the Democrats may elect a majority of the common council, and the president of the common council would naturally be a Democrat, and the majority of the common council being of opposite political faith to that of the mayor the third member would be a Democrat.

The member selected by the common council is not necessarily the minority member; the statute does not speak of him as such; he is designated by it as "third member." The members of the common council who select him may be in the majority or in the minority in the city, county, State or Nation; they may be the majority or the minority of the common council.

The party in the majority in the city, county, State or Nation, at the time that the members of the board are chosen, may be in the minority at the next election; nothing is to be determined by the political faith of the inspectors to be appointed; in one election district the majority may be of one party, and in the adjoining district of the opposite, and taking the city as a whole the majority of the inspectors of election may belong to the party which is in the minority on the total vote. The third member may be in a political minority in the board so far as State issues are concerned, the issues which determined his selection, and yet be one of the majority of the board on local issues, which issues as we have seen determine the selection of inspectors of election.

It must be apparent, therefore, that the majority party does not determine who are the majority or minority members or member of such board. The only requirement of the statute as to the third member is, that he shall be chosen by the members of the common council of opposite political faith on State issues to that of the mayor, the intention, of course, being that the person so chosen shall also be of opposite political faith on State issues to that of the mayor.

The statute does not contemplate that he shall name the inspectors of his political faith ; he may or may not be the minority member of the board ; if he is, then he names or solely selects the inspectors of his political faith ; if he is not, then as one of the majority of the board he joins in selecting inspectors of the opposite political faith to that of those named by the minority member.

The board of election commissioners is appointed to hold office for a term which covers a number of elections, and it is needless to observe that it is no new thing for men to change their political faith, so that what would be a political majority in the board at one period of its existence, might very well become a political minority at another period.

I hardly think that anyone would contend that where there had been such a change of faith, or where the composition of the board had been changed by the death, resignation or removal from office of any one of the original members of the board, and one of a different faith installed in his place, that the original members of the board still retained their position as majority and minority members of the board. The status then of the members of the board, does not become fixed as first organized and thereafter remain unchangeable ; to hold that, would be placing a construction upon the statute which seems to me would lead to a violation of its spirit and intention, and lead to unjust and absurd conclusions.

That the status is not so fixed at the time of their election, or the election of any one of them, I think is also indicated by the law from which this is taken, the one authorizing the appointment by the police commissioners of the city of Albany, and where as before stated the police commissioners that were elected as such, being elected for a term of four-years, and the mayor being elected for two years, and the statute at that time prohibiting his re-election, it was

possible for those who were the minority members during the first period of their term to be a part of the majority of the board during the other part of their term.

Neither, I think, can it be consistently contended that when by a mischievous or corrupt combination, or by a union of members on local issues who are of opposite political faith on State or National issues, the one who was theretofore a minority member becomes one of the majority, he can at the same time still retain and exercise the power that the statute gives to the minority member. Such a construction would leave one member of the board without any voice in the selection of election officers. · Such a construction would also lead to the very abuses and dangers to be apprehended, from permitting a board or commission, the members of which are all of the same political faith, to appoint the election officers, not only for their own, but for the opposing political party.

If by an honest change of political faith the minority of the board becomes the majority it should only seek to control, and, it seems to me, would only be permitted to control, the appointment of the inspectors for its own party, leaving the remaining member of the board to select those for his party, and not seeking or being permitted to control the appointment of officers for both parties. And I can see no reason for a different rule when the minority becomes a majority, not by an honest change of political belief, but by a mischievous or corrupt combination, or by a union upon local issues ; to hold the latter, would be to hold that within the intention and spirit of the law all the persons appointed election officers may be appointed by members of the same faith and opinions, upon the very issues the law says the inspectors shall be divided upon ; this manifestly leads to an unjust conclusion, is contrary to the intention of the statute, and is, therefore, contrary to the canons of statutory construction.

How, then, is the question of who is the minority member to be determined ? One way is by the actions of the different members of the board from time to time, which indicate who is, in truth, within the meaning of the statute, the minority. and who are the majority.

The objections that are made to this construction are that members of the board may secretly combine together, or that they may

divide their votes on different questions that come up, and only vote together upon the appointment of inspectors, or that there may be a secret change of political faith, or that the majority members may honestly disagree upon the names of the persons to be appointed by them, and then that no appointment can be made unless the third member votes with one or the other of them, or that there may be a difference of opinion as to whether some of the persons named are fit persons to serve as election officers.

These objections do not in anywise affect the principle, but simply present difficulties in applying it, difficulties in discovering the fact whether in truth the minority has become a part of the majority of the board, whether the differences are over particular persons to be appointed, or whether there has been a change in the political complexion of the board, by honest change of political faith, by mischievous combination, or by a union upon local issues of those opposed to each other on other political issues. The facts here do not present any of these apprehended difficulties. It will be time enough to meet them when they arise. In this case the facts are undisputed; two of the members of the board acted together against the third, and the two so acting together claim to have appointed all the election officers. Do these two officers acting together constitute both the majority and the minority of the board?

The language of the statute is plain and unambiguous. The words "majority" and "minority" are words in common use, and have ordinarily a well-understood meaning, and there is no occasion to give a definition of those words here. "The words of a statute, if of common use, are to be taken in their natural, plain, obvious and ordinary signification." (*People ex rel. Bockes* v. *Wemple*, 115 N. Y. 302–307.)

If we give the words used the same meaning that we would if they were used in any other statute, we will have no difficulty in determining who are majority members, and who is in the minority; it will be by seeing who are acting in concert, and who stands alone; it is only in attempting to solve that meaning by political considerations, and by the political beliefs of the members of the board, that causes any difficulty to arise in determining the meaning of the words used.

The members of the board may so conduct themselves as to make

it difficult to discover who are acting together, and who is acting alone, but when that is discovered the way is clear.

The language used must be given its natural and obvious meaning. (*Fifth Avenue Bank* v. *Colgate*, 120 N. Y. 381–394.)

Let us endeavor then to determine the question the same as we would if it was a statute relating to a private, instead of a political or municipal corporation, by seeing who are acting in concert with each other, and who stands alone in the board. If there is a minority, then there must be a majority, and the ascertainment of the one determines the others.

It is apparent from the proceedings in this case that, whether from a change in political belief, or from a perverse or mischievous combination, or from a union on local issues, the majority of this board is differently composed than it was when last it met to perform its official duties; then Mr. Manning and Mr. Armatage were acting together.

Now, Messrs. Armatage and Gregory are acting together; they unite in the issuing of the notice or call for a meeting of the board; Mr. Manning formerly presided over its meetings; they unite in electing Mr. Armatage to preside in his place; they unite in awarding to the Democrats the majority in a lesser number of the election districts of the city than had been awarded to them at the last selection of election officers, although no election for a mayor for the city of Albany had intervened.

There is no disagreement over particular names of persons, nor any question raised as to the fitness of any person named to serve as an election officer. The disagreement and division is as to the entire lists of names presented.

Ever since this method of selecting election officers has been in vogue, it appears to have been the custom to appoint as Democratic election officers those persons whose names were presented by the Democratic general committee.

Messrs. Armatage and Gregory unite in rejecting that list, and appointing other persons in their place; they finally unite in naming not only the Democratic inspectors but the Republican election officers; they unite in depriving Mr. Manning of any voice in the selection of these officers, and it seems to me that in short they

acted in concert and combination all through the proceedings, and I can see no other reasonable construction of their acts, but to hold that they are the majority of the board; if they are the majority of the board, it necessarily follows that the remaining member is the minority member of the board.

This construction, I think, fully carries out the spirit and intention of the law, and it necessarily results in having election inspectors appointed by those who are in hostility to each other, and who consequently will appoint inspectors of election who will be antagonistic to one another, which is what the law intends and contemplates, and it gives to the words used in the statute their natural, plain, obvious and ordinary significance.    (*People ex rel. Bockes* v. *Wemple, supra.*)

The opposite construction will allow members of the same political faith, or those who have entered into a combination with each other on local or other issues, to appoint the inspectors for both political parties, inspectors who will act in harmony with each other, and with a common purpose and understanding, and thus defeat the spirit of the law.

That this latter construction is a dangerous one, and one by means of which the intent and purpose of the law can be defeated, has an illustration in this case; not only was the list of officers presented by one of the party organizations ignored; which, although contrary to precedent, the board legally had a right to do, but it also appears that in some election districts of the city the election officers named as Democrats in the list presented by Mr. Armatage, were in truth and in fact Republicans, so that in such election districts all the election officers were of one political faith; to what extent this was carried does not appear from the papers in this case, which are somewhat scanty, owing perhaps to the shortness of the time elapsing between the order to show cause and the time of its return, but whether few or many, they afford a demonstration of the evils of the construction contended for by the relator, and the propriety and necessity of the construction we have placed upon this statute, to carry into effect its spirit and intent.

It would follow from this that the list of inspectors designated by Mr. Manning was legally designated by him as the minority member of the board.

But it is said that the election officers shall be appointed by the

board, and that the Manning list was never appointed by the board, but was simply designated by Mr. Manning. It is true that the board is to make the appointment, but the statute says that the inspectors of election selected to represent the party of the same political faith as the minority member, shall be selected solely by him; and it follows, as a matter of course, that it is the duty of the board to appoint as inspectors of election the persons so selected by the minority member, and that duty can be enforced by mandamus, and because they failed to perform that duty does not affect the legality of the action of the minority member.

The persons designated by Mr. Manning to serve as inspectors of election having been legally selected by him as the minority member of the board, and it being the duty of the board to appoint them as inspectors of election, it follows that the relator was not entitled to the mandamus prayed for by him, and that the order granting it should be reversed.

Let the order of the Special Term be reversed, with ten dollars costs and printing and other disbursements.

MAYHAM, P. J., concurred in result.

PUTNAM, J. (dissenting):

After a careful consideration of this case, I have reached the conclusion that the order directing a peremptory mandamus to issue was properly granted by the court below, for the reasons stated by Justice FURSMAN in his opinion. His elaborate review of the questions involved renders it unnecessary to write any other opinion in the case.

The order should be affirmed, with costs and disbursements.

Order reversed, with ten dollars costs and printing disbursements.