# CHURCH OF THE HOLY TRINITY *v.* UNITED STATES.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

No. 143. Argued and submitted January 7, 1892. — Decided February 29, 1892.

The act of February 26, 1885, " to prohibit the importation and migration of foreigners and aliens under contract or agreement to perform labor in the United States, its Territories, and the District of Columbia," 23 Stat. 332, c. 164, does not apply to a contract between an alien, residing out of the United States, and a religious society incorporated under the laws of a State, whereby he engages to remove to the United States and to enter into the service of the society as its rector or minister.

THE case is stated in the opinion. .

Mr. *Seaman Miller* for plaintiff in error.

Mr. *Assistant Attorney General Maury* for defendant in error submitted on his brief.

MR. JUSTICE BREWER delivered the opinion of the court.

Plaintiff in error is a corporation, duly organized and incorporated as a religious society under the laws of the State of New York. E. Walpole Warren was, prior to September,

1887, an alien residing in England. In that month the plaintiff in error made a contract with him, by which he was to remove to the city of New York and enter into its service as rector and pastor; and in pursuance of such contract, Warren did so remove and enter upon such service. It is claimed by the United States that this contract on the part of the plaintiff in error was forbidden by the act of February 26, 1885, 23 Stat. 332, c. 164, and an action was commenced to recover the penalty prescribed by that act. The Circuit Court held that the contract was within the prohibition of the statute, and rendered judgment accordingly, (36 Fed. Rep. 303;) and the single question presented for our determination is whether it erred in that conclusion.

The first section describes the act forbidden, and is in these words:

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That from and after the passage of this act it shall be unlawful for any person, company, partnership, or corporation, in any manner whatsoever, to prepay the transportation, or in any way assist or encourage the importation or migration of any alien or aliens, any foreigner or foreigners, into the United States, its Territories, or the District of Columbia, under contract or agreement, parol or special, express or implied, made previous to the importation or migration of such alien or aliens, foreigner or foreigners, to perform labor or service of any kind in the United States, its Territories, or the District of Columbia."

It must be conceded that the act of the corporation is within the letter of this section, for the relation of rector to his church is one of service, and implies labor on the one side with compensation on the other. Not only are the general words labor and service both used, but also, as it were to guard against any narrow interpretation and emphasize a breadth of meaning, to them is added "of any kind;" and, further, as noticed by the Circuit Judge in his opinion, the fifth section, which makes specific exceptions, among them professional actors, artists, lecturers, singers and domestic

servants, strengthens the idea that every other kind of labor and service was intended to be reached by the first section. While there is great force to this reasoning, we cannot think Congress intended to denounce with penalties a transaction like that in the present case. It is a familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers. This has been often asserted, and the reports are full of cases illustrating its application. This is not the substitution of the will of the judge for that of the legislator, for frequently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act. As said in Plowden, 205 : "From which cases, it appears that the sages of the law heretofore have construed statutes quite contrary to the letter in some appearance, and those statutes which comprehend all things in the letter they have expounded to extend to but some things, and those which generally prohibit all people from doing such an act they have interpreted to permit some people to do it, and those which include every person in the letter, they have adjudged to reach to some persons only, which expositions have always been founded upon the intent of the legislature; which they have collected sometimes by considering the cause and necessity of making the act, sometimes by comparing one part of the act with another, and sometimes by foreign circumstances."

In *Margate Pier Co.* v. *Hannam*, 3 B. & Ald. 266, 270, Abbott, C. J. quotes from Lord Coke as follows: "Acts of Parliament are to be so construed as no man that is innocent or free from injury or wrong be, by a literal construction, punished or endamaged." In the case of the *State* v. *Clark*, 5 Dutcher, (29 N. J. Law) 96, 98, 99, it appeared that an act had been passed making it a misdemeanor to wilfully break down a fence in the possession of another person. Clark was indicted

under that statute. The defence was that the act of breaking down the fence, though wilful, was in the exercise of a legal right to go upon his own lands. The trial court rejected the testimony offered to sustain the defence, and the Supreme Court held that this ruling was error. In its opinion the court used this language: "The act of 1855, in terms, makes the wilful opening, breaking down or injuring of any fences belonging to or in the possession of any other person a misdemeanor. In what sense is the term wilful used? In common parlance, wilful is used in the sense of intentional, as distinguished from accidental or involuntary. Whatever one does intentionally he does wilfully. Is it used in that sense in this act? Did the legislature intend to make the intentional opening of a fence for the purpose of going upon the land of another indictable, if done by permission or for a lawful purpose? . . . We cannot suppose such to have been the actual intent. To adopt such a construction would put a stop to the ordinary business of life. The language of the act, if construed literally, evidently leads to an absurd result. If a literal construction of the words of a statute be absurd, the act must be so construed as to avoid the absurdity. The court must restrain the words. The object designed to be reached by the act must limit and control the literal import of the terms and phrases employed." In *United States* v. *Kirby*, 7 Wall. 482, 486, the defendants were indicted for the violation of an act of Congress, providing "that if any person shall knowingly and wilfully obstruct or retard the passage of the mail, or of any driver or carrier, or of any horse or carriage carrying the same, he shall, upon conviction, for every such offence pay a fine not exceeding one hundred dollars." The specific charge was that the defendants knowingly and wilfully retarded the passage of one Farris, a carrier of the mail, while engaged in the performance of his duty, and also in like manner retarded the steamboat General Buell, at that time engaged in carrying the mail. To this indictment the defendants pleaded specially that Farris had been indicted for murder by a court of competent authority in Kentucky; that a bench warrant had been issued and

placed in the hands of the defendant Kirby, the sheriff of the county, commanding him to arrest Farris and bring him before the court to answer to the indictment ; and that in obedience to this warrant, he and the other defendants, as his posse, entered upon the steamboat General Buell and arrested Farris, and used only such force as was necessary to accomplish that arrest. The question as to the sufficiency of this plea was certified to this court, and it was held that the arrest of Farris upon the warrant from the state court was not an obstruction of the mail, or the retarding of the passage of a carrier of the mail, within the meaning of the act. In its opinion the court says : " All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression or an absurd consequence. It will always, therefore, be presumed that the legislature intended exceptions to its language which would avoid results of this character. The reason of the law in such cases should prevail over its letter. The common sense of man approves the judgment mentioned by Puffendorf, that the Bolognian law which enacted 'that whoever drew blood in the streets should be punished with the utmost severity,' did not extend to the surgeon who opened the vein of a person that fell down in the street in a fit. The same common sense accepts the ruling, cited by Plowden, that the statute of 1st Edward II., which enacts that a prisoner who breaks prison shall be guilty of felony, does not extend to a prisoner who breaks out when the prison is on fire, 'for he is not to be hanged because he would not stay to be burnt.' And we think that a like common sense will sanction the ruling we make, that the act of Congress which punishes the obstruction or retarding of the passage of the mail, or of its carrier, does not apply to a case of temporary detention of the mail caused by the arrest of the carrier upon an indictment for murder." The following cases may also be cited. *Henry* v. *Tilson,* 17 Vermont, 479 ; *Ryegate* v. *Wardsboro,* 30 Vermont, 746 ; *Ex parte Ellis,* 11 California, 222 ; *Ingraham* v. *Speed,* 30 Mississippi, 410 ; *Jackson* v. *Collins,* 3 Cowen, 89 ; *People* v. *Insurance Company,* 15 Johns. 358 ; *Burch* v. *Newbury,* 10 N. Y. 374 ; *People* v. *N. Y.*

*Commissioners of Taxes*, 95 N. Y. 554, 558; *People* v. *Lacombe*, 99 N. Y. 43, 49; *Canal Co.* v. *Railroad Co.*, 4 G. & J., 1, 152; *Osgood* v. *Breed*, 12 Mass. 525, 530; *Wilbur* v. *Crane*, 13 Pick. 284; *Oates* v. *National Bank*, 100 U. S. 239.

Among other things which may be considered in determining the intent of the legislature is the title of the act. We do not mean that it may be used to add to or take from the body of the statute, *Hadden* v. *The Collector*, 5 Wall. 107, but it may help to interpret its meaning. In the case of *United States* v. *Fisher*, 2 Cranch, 358, 386, Chief Justice Marshall said: " On the influence which the title ought to have in construing the enacting clauses much has been said; and yet it is not easy to discern the point of difference between the opposing counsel in this respect. Neither party contends that the title of an act can control plain words in the body of the statute; and neither denies that, taken with other parts, it may assist in removing ambiguities. Where the intent is plain, nothing is left to construction. Where the mind labors to discover the design of the legislature, it seizes everything from which aid can be derived; and in such case the title claims a degree of notice, and will have its due share of consideration." And in the case of *United States* v. *Palmer*, 3 Wheat. 610, 631, the same judge applied the doctrine in this way: " The words of the section are in terms of unlimited extent. The words ' any person or persons' are broad enough to comprehend every human being. But general words must not only be limited to cases within the jurisdiction of the State, but also to those objects to which the legislature intended to apply them. Did the legislature intend to apply these words to the subjects of a foreign power, who in a foreign ship may commit murder or robbery on the high seas? The title of an act cannot control its words, but may furnish some aid in showing what was in the mind of the legislature. The title of this act is, ' An act for the punishment of certain crimes against the United States.' It would seem that offences against the United States, not offences against the human race, were the crimes which the legislature intended by this law to punish."

It will be seen that words as general as those used in the first section of this act were by that decision limited, and the intent of Congress with respect to the act was gathered partially, at least, from its title. "Now, the title of this act is, "An act to prohibit the importation and migration of foreigners and aliens under contract or agreement to perform labor in the United States, its Territories and the District of Columbia." Obviously the thought expressed in this reaches only to the work of the manual laborer, as distinguished from that of the professional man. No one reading such a title would suppose that Congress had in its mind any purpose of staying the coming into this country of ministers of the gospel, or, indeed, of any class whose toil is that of the brain. The common understanding of the terms labor and laborers does not include preaching and preachers; and it is to be assumed that words and phrases are used in their ordinary meaning. So whatever of light is thrown upon the statute by the language of the title indicates an exclusion from its penal provisions of all contracts for the employment of ministers, rectors and pastors.

Again, another guide to the meaning of a statute is found in the evil which it is designed to remedy; and for this the court properly looks at contemporaneous events, the situation as it existed, and as it was pressed upon the attention of the legislative body. *United States* v. *Union Pacific Railroad*, 91 U. S. 72, 79. The situation which called for this statute was briefly but fully stated by Mr. Justice Brown when, as District Judge, he decided the case of *United States* v. *Craig*, 28 Fed. Rep. 795, 798: "The motives and history of the act are matters of common knowledge. It had become the practice for large capitalists in this country to contract with their agents abroad for the shipment of great numbers of an ignorant and servile class of foreign laborers, under contracts, by which the employer agreed, upon the one hand, to prepay their passage, while, upon the other hand, the laborers agreed to work after their arrival for a certain time at a low rate of wages. The effect of this was to break down the labor market, and to reduce other laborers engaged in like occupations to the level

of the assisted immigrant. The evil finally became so flagrant that an appeal was made to Congress for relief by the passage of the act in question, the design of which was to raise the standard of foreign immigrants, and to discountenance the migration of those who had not sufficient means in their own hands, or those of their friends, to pay their passage."

It appears, also, from the petitions, and in the testimony presented before the committees of Congress, that it was this cheap unskilled labor which was making the trouble, and the influx of which Congress sought to prevent. It was never suggested that we had in this country a surplus of brain toilers, and, least of all, that the market for the services of Christian ministers was depressed by foreign competition. Those were matters to which the attention of Congress, or of the people, was not directed. So far, then, as the evil which was sought to be remedied interprets the statute, it also guides to an exclusion of this contract from the penalties of the act.

A singular circumstance, throwing light upon the intent of Congress, is found in this extract from the report of the Senate Committee on Education and Labor, recommending the passage of the bill: "The general facts and considerations which induce the committee to recommend the passage of this bill are set forth in the Report of the Committee of the House. The committee report the bill back without amendment, although there are certain features thereof which might well be changed or modified, in the hope that the bill may not fail of passage during the present session. Especially would the committee have otherwise recommended amendments, substituting for the expression 'labor and service,' whenever it occurs in the body of the bill, the words 'manual labor' or 'manual service,' as sufficiently broad to accomplish the purposes of the bill, and that such amendments would remove objections which a sharp and perhaps unfriendly criticism may urge to the proposed legislation. The committee, however, believing that the bill in its present form will be construed as including only those whose labor or service is manual in character, and being very desirous that the bill become a law before the adjournment, have reported the bill without

change." 6059, Congressional Record, 48th Congress.   And, referring back to the report of the Committee of the House, there appears this language: "It seeks to restrain and prohibit the immigration or importation of laborers who would have never seen our shores but for the inducements and allurements of men whose only object is to obtain labor at the lowest possible rate, regardless of the social and material well-being of our own citizens and regardless of the evil consequences which result to American laborers from such immigration. This class of immigrants care nothing about our institutions, and in many instances never even heard of them; they are men whose passage is paid by the importers; they come here under contract to labor for a certain number of years; they are ignorant of our social condition, and that they may remain so they are isolated and prevented from coming into contact with Americans.   They are generally from the lowest social stratum, and live upon the coarsest food and in hovels of a character before unknown to American workmen.   They, as a rule, do not become citizens, and are certainly not a desirable acquisition to the body politic.   The inevitable tendency of their presence among us is to degrade American labor, and to reduce it to the level of the imported pauper labor."   Page 5359, Congressional Record, 48th Congress.

We find, therefore, that the title of the act, the evil which was intended to be remedied, the circumstances surrounding the appeal to Congress, the reports of the committee of each house, all concur in affirming that the intent of Congress was simply to stay the influx of this cheap unskilled labor.

But beyond all these matters no purpose of action against religion can be imputed to any legislation, state or national, because this is a religious people.   This is historically true. From the discovery of this continent to the present hour, there is a single voice making this affirmation.   The commission to Christopher Columbus, prior to his sail westward, is from "Ferdinand and Isabella, by the grace of God, King and Queen of Castile," etc., and recites that "it is hoped that by God's assistance some of the continents and islands in the

ocean will be discovered," etc.   The first colonial grant, that made to Sir Walter Raleigh in 1584, was from "Elizabeth, by the grace of God, of England, Fraunce and Ireland, queene, defender of the faith," etc. ; and the grant authorizing him to enact statutes for the government of the proposed colony provided that "they be not against the true Christian faith nowe professed in the Church of England." The first charter of Virginia, granted by King James I in 1606, after reciting the application of certain parties for a charter, commenced the grant in these words: "We, greatly commending, and graciously accepting of, their Desires for the Furtherance of so noble a Work, which may, by the Providence of Almighty God, hereafter tend to the Glory of his Divine Majesty, in propagating of Christian Religion to such People, as yet live in Darkness and miserable Ignorance of the true Knowledge and Worship of God, and may in time bring the Infidels and Savages, living in those parts, to human Civility, and to a settled and quiet Government; DO, by these our Letters-Patents, graciously accept of, and agree to, their humble and well-intended Desires."

Language of similar import may be found in the subsequent charters of that colony, from the same king, in 1609 and 1611 ; and the same is true of the various charters granted to the other colonies. In language more or less emphatic is the establishment of the Christian religion declared to be one of the purposes of the grant. The celebrated compact made by the Pilgrims in the Mayflower, 1620, recites : " Having undertaken for the Glory of God, and Advancement of the Christian Faith, and the Honour of our King and Country, a Voyage to plant the first Colony in the northern Parts of Virginia; Do by these Presents, solemnly and mutually, in the Presence of God and one another, covenant and combine ourselves together into a civil Body Politick, for our better Ordering and Preservation, and Furtherance of the Ends aforesaid."

The fundamental orders of Connecticut, under which a provisional government was instituted in 1638–1639, commence with this declaration : " Forasmuch as it hath pleased the Allmighty God by the wise disposition of his diuyne pruidence

so to·Order and dispose of things that we the Inhabitants and Residents of Windsor, Hartford and Wethersfield are now cohabiting and dwelling in and vppon the River of Conectecotte and the Lands thereunto adioyneing; And well knowing where a people are gathered togather the word of God requires that to mayntayne the peace and vnion of such a people there should be an orderly and decent Gouerment established according to God, to order and dispose of the affayres of the people at all seasons as occation shall require; doe therefore assotiate and conioyne our selues to be as one Publike State or Comonwelth; and doe, for·our selues and our Successors and such as shall be adioyned to·vs att any tyme hereafter, enter into Combination and Confederation to gather, to mayntayne and presearue the liberty and purity of the gospell of our Lord Jesus w$^{ch}$ we now p$^r$fesse, as also the disciplyne of the Churches, w$^{ch}$ according to the truth of the said gospell is now practised amongst vs."

In the charter of privileges granted by William Penn to the province of Pennsylvania, in 1701, it is recited : " Because no People can be truly, happy, though under the greatest Enjoyment of Civil Liberties, if abridged of the Freedom of their Consciences, as to their Religious Profession and Worship; And Almighty God being the only Lord of Conscience, Father of Lights and Spirits ; and the Author as well as Object of all divine Knowledge, Faith and Worship, who only doth enlighten the Minds, and persuade and convince the Understandings of People, I do hereby grant and declare," etc.

Coming nearer to the present time, the Declaration of Independence recognizes the presence of the Divine in human affairs in these words : "We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty, and the pursuit of Happiness." " We, therefore, the Representatives of the united States of America, in General Congress, Assembled, appealing to the Supreme Judge of the world for the rectitude of our intentions, do, in the Name and by Authority of the good People of these Colonies, solemnly publish and declare," etc.; "And for the sup-

port of this Declaration, with a firm reliance on the Protection of Divine Providence, we mutually pledge to each other our Lives, our Fortunes, and our sacred Honor."

If we examine the constitutions of the various States we find in them a constant recognition of religious obligations. Every constitution of every one of the forty-four States contains language which either directly or by clear implication recognizes a profound reverence for religion and an assumption that its influence in all human affairs is essential to the well being of the community This recognition may be in the preamble, such as is found in the constitution of Illinois, 1870: "We, the people of the State of Illinois, grateful to Almighty God for the civil, political and religious liberty which He hath so long permitted us to enjoy, and looking to Him for a blessing upon our endeavors to secure and transmit the same unimpaired to succeeding generations," etc.

It may be only in the familiar requisition that all officers shall take an oath closing with the declaration "so help me God." It may be in clauses like that of the constitution of Indiana, 1816, Article XI, section 4: "The manner of administering an oath or affirmation shall be such as is most consistent with the conscience of the deponent, and shall be esteemed the most solemn appeal to God." Or in provisions such as are found in Articles 36 and 37 of the Declaration of Rights of the Constitution of Maryland, 1867: "That as it is the duty of every man to worship God in such manner as he thinks most acceptable to Him, all persons are equally entitled to protection in their religious liberty; wherefore, no person ought, by any law, to be molested in his person or estate on account of his religious persuasion or profession, or for his religious practice, unless, under the color of religion, he shall disturb the good order, peace or safety of the State, or shall infringe the laws of morality, or injure others in their natural, civil or religious rights; nor ought any person to be compelled to frequent or maintain or contribute, unless on contract, to maintain any place of worship, or any ministry; nor shall any person, otherwise competent, be deemed incompetent as a witness, or juror, on account of his religious belief: *Provided*, He

believes in the existence of God, and that, under His dispensation, such person will be held morally accountable for his acts, and be rewarded or punished therefor, either in this world or the world to come. That no religious test ought ever to be required as a qualification for any office of profit or trust in this State other than a declaration of belief in the existence of God; nor shall the legislature prescribe any other oath of office than the oath prescribed by this constitution." Or like that in Articles 2 and 3, of Part 1st, of the Constitution of Massachusetts, 1780: "It is the right as well as the duty of all men in society publicly and at stated seasons, to worship the Supreme Being, the great Creator and Preserver of the universe. . . . As the happiness of a people and the good order and preservation of civil government essentially depend upon piety, religion and morality, and as these cannot be generally diffused through a community but by the institution of the public worship of God and of public instructions in piety, religion and morality: Therefore, to promote their happiness and to secure the good order and preservation of their government, the people of this commonwealth have a right to invest their legislature with power to authorize and require, and the legislature shall, from time to time, authorize and require, the several towns, parishes, precincts and other bodies-politic or religious societies to make suitable provision, at their own expense, for the institution of the public worship of God and for the support and maintenance of public Protestant teachers of piety, religion and morality in all cases where such provision shall not be made voluntarily." Or as in sections 5 and 14 of Article 7, of the constitution of Mississippi, 1832: "No person who denies the being of a God, or a future state of rewards and punishments, shall hold any office in the civil department of this State. . . . Religion, morality and knowledge being necessary to good government, the preservation of liberty, and the happiness of mankind, schools and the means of education, shall forever be encouraged in this State." Or by Article 22 of the constitution of Delaware, 1776, which required all officers, besides an oath of allegiance, to make and subscribe the following declaration: "I, A. B., do profess

faith in God the Father, and in Jesus Christ His only Son, and in the Holy Ghost, one God, blessed for evermore; and I do acknowledge the Holy Scriptures of the Old and New Testament to be given by divine inspiration."

Even the Constitution of the United States, which is supposed to have little touch upon the private life of the individual, contains in the First Amendment a declaration common to the constitutions of all the States, as follows: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof," etc. And also provides in Article 1, section 7, (a provision common to many constitutions,) that the Executive shall have ten days (Sundays excepted) within which to determine whether he will approve or veto a bill.

There is no dissonance in these declarations. There is a universal language pervading them all, having one meaning; they affirm and reaffirm that this is a religious nation. These are not individual sayings, declarations of private persons: they are organic utterances; they speak the voice of the entire people. While because of a general recognition of this truth the question has seldom been presented to the courts, yet we find that in *Updegraph v. The Commonwealth*, 11 S. & R. 394, 400, it was decided that, "Christianity, general Christianity, is, and always has been, a part of the common law of Pennsylvania; . . . not Christianity with an established church, and tithes, and spiritual courts; but Christianity with liberty of conscience to all men." And in *The People v. Ruggles*, 8 Johns. 290, 294, 295, Chancellor Kent, the great commentator on American law, speaking as Chief Justice of the Supreme Court of New York, said: "The people of this State, in common with the people of this country, profess the general doctrines of Christianity, as the rule of their faith and practice; and to scandalize the author of these doctrines is not only, in a religious point of view, extremely impious, but, even in respect to the obligations due to society, is a gross violation of decency and good order. . . . The free, equal and undisturbed enjoyment of religious opinion, whatever it may be, and free and decent discussions on any religious

subject, is granted and secured; but to revile, with malicious and blasphemous contempt the religion professed by almost the whole community, is an abuse of that right. Nor are we bound, by any expressions in the Constitution as some have strangely supposed, either not to punish at all, or to punish indiscriminately, the like attacks upon the religion of *Mahomet* or of the Grand *Lama;* and for this plain reason; that the case assumes that we are a Christian people, and the morality of the country is deeply ingrafted upon Christianity, and not upon the doctrines or worship of those impostors." And in the famous case of *Vidal* v. *Girard's Executors,* 2 How. 127, 198, this court, while sustaining the will of Mr. Girard, with its provision for the creation of a college into which no minister should be permitted to enter, observed: "It is also said, and truly, that the Christian religion is a part of the common law of Pennsylvania."

If we pass beyond these matters to a view of American life as expressed by its laws, its business, its customs and its society, we find everywhere a clear recognition of the same truth. Among other matters note the following: The form of oath universally prevailing, concluding with an appeal to the Almighty; the custom of opening sessions of all deliberative bodies and most conventions with prayer; the prefatory words of all wills, "In the name of God, amen;" the laws respecting the observance of the Sabbath, with the general cessation of all secular business, and the closing of courts, legislatures, and other similar public assemblies on that day; the churches and church organizations which abound in every city, town and hamlet; the multitude of charitable organizations existing everywhere under Christian auspices; the gigantic missionary associations, with general support, and aiming to establish Christian missions in every quarter of the globe. These, and many other matters which might be noticed, add a volume of unofficial declarations to the mass of organic utterances that this is a Christian nation. In the face of all these, shall it be believed that a Congress of the United States intended to make it a misdemeanor for a church of this country to contract for the services of a Christian minister residing in another nation?

Suppose in the Congress that passed this act some member had offered a bill which in terms declared that, if any Roman Catholic church in this country should contract with Cardinal Manning to come to this country and enter into its service as pastor and priest; or any Episcopal church should enter into a like contract with Canon Farrar; or any Baptist church should make similar arrangements with Rev. Mr. Spurgeon; or any Jewish synagogue with some eminent Rabbi, such contract should be adjudged unlawful and void, and the church making it be subject to prosecution and punishment, can it be believed that it would have received a minute of approving thought or a single vote? Yet it is contended that such was in effect the meaning of this statute. The construction invoked cannot be accepted as correct. It is a case where there was presented a definite evil, in view of which the legislature used general terms with the purpose of reaching all phases of that evil, and thereafter, unexpectedly, it is developed that the general language thus employed is broad enough to reach cases and acts which the whole history and life of the country affirm could not have been intentionally legislated against. It is the duty of the courts, under those circumstances, to say that, however broad the language of the statute may be, the act, although within the letter, is not within the intention of the legislature, and therefore cannot be within the statute.

*The judgment will be reversed, and the case remanded for further proceedings in accordance with this opinion.*