## A. E. STALEY MFG. CO. et al. v. FEDERAL TRADE COMMISSION.

No. 8072.

Circuit Court of Appeals, Seventh Circuit.

July 6, 1944.

Writ of Certiorari Granted Nov. 20, 1944.

See 65 S.Ct. 189.

C. C. LeForgee and Carl R. Miller, both of Decatur, Ill. (LeForgee, Samuels & Miller, of Decatur, Ill., of counsel), for petitioner.

Joseph J. Smith, Jr., Walter B. Wooden, Asst. Chief Counsel, and W. T. Kelley, Chief Counsel, Federal Trade Commission, all of Washington, D. C., for respondent.

Before EVANS, MAJOR, and MINTON, Circuit Judges.

MINTON, Circuit Judge.

The Federal Trade Commission filed a complaint against the A. E. Staley Manufacturing Company and the Staley Sales Corporation charging them with a violation of Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C.A. § 13(a).[1] The Commission claimed that the discriminations which the

---

[1] "(a) It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where

petitioners practiced in violation of the above statute arose from the Staley companies' practices of applying the basing point system in formulating their prices and of permitting favored customers unfair use of the so-called "booking" privileges. The Commission found that there were discriminations and that such discriminations "have resulted, and do result, in substantial injury to competition among purchasers of glucose * * *." The Commission ordered the companies to cease and desist from the use of these practices. The companies filed their petition before us to review the order of the Commission and the Commission cross-petitioned for enforcement.

On such petition for review and the cross-petition for enforcement, this matter was before us at the April Session in 1943. On May 10, 1943, we held the complaint to be sufficient but remanded the cause to the Commission for "further consideration and hearings if necessary, in order to show with more clarity, if the Commission can, wherein the discriminations occur and how they substantially lessen competition and promote monopoly, and for proper findings thereon; and for consideration of the defense urged by the petitioners, and for findings in relation thereto." 135 F.2d 453, 456. Upon the remand, the Commission did not hear any additional evidence. It merely restated its findings of fact which were, for the most part, twenty-seven pages of argumentative dissertations in support of the Commission's thesis. The so-called findings of fact had to be sifted to find what the facts found were. The Commission again found that there was discrimination and that the effect of such discrimination "may be substantially to lessen competition or tend to create a monopoly," and left the order to cease and desist as originally entered. The matter is now before us for disposition after this remand and reconsideration.

The A. E. Staley Manufacturing Company operates a corn products processing plant at Decatur, Illinois. The Staley Sales Corporation is a wholly-owned subsidiary used for the purpose of marketing the manufactured products of the A. E. Staley Manufacturing Company. Among other things, the petitioners produce and sell in interstate commerce unmixed corn syrup, commonly called glucose. Shipments are usually made in tank cars but not in every instance. All shipments are made from Decatur. The companies' competitors are numerous other corporations who sell and ship similar syrup in interstate commerce. The glucose sold by the companies is used primarily in the manufacture of candy and mixed table syrup. Glucose comprises 5% to 90% of the finished weight of the candies produced and the prices paid for it are a substantial part of the total raw material cost of manufacture, especially in the cheaper lines of candy. Glucose is used in greater proportion in candies which are sold by candy manufacturers at a few cents a pound and on a narrow margin of profit. The margin of profit of such candy manufacturers is so narrow that business may be controlled on a concession of one eighth of a cent a pound. In the mixed table syrup, 85% of the mixture is glucose.

The so-called basing point system consists of taking the price of the commodity in Chicago and adding thereto the freight to the place of destination. As practiced by the petitioners, this was without regard to the fact that none of their shipments were made from Chicago but all were made from Decatur. Thus, a buyer who lived in Decatur, where the companies operate their plant, would pay the Chicago base plus freight from Chicago to Decatur, although the goods had never been in Chicago but were always in Decatur and were there delivered to the purchaser. The same thing was true on shipments to all other points, such as Kansas City, Dallas, Sioux City, Little Rock, St. Louis, St. Joseph, Missouri, and other cities. Notwithstanding the fact that Decatur is nearer to these cities and that the freight rate from Decatur to them was lower than the rate from Chicago, the purchasers in these cities were charged freight from Chicago, although the goods were shipped from Decatur. The maximum amount of discrimination is between Decatur and Chicago, and sometimes Decatur customers are discriminated against in favor of Chicago customers by as much as 16%. Wherever the actual cost of delivery from Decatur is less than the cost of delivery from Chicago, the companies added the difference to the net prices at Decatur. This is what the Commission des-

---

the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce * * *."

ignated as "phantom freight," for which the companies did not pay. Discriminations under this practice have resulted at various times in differences as great as:

| | | | | |
|---|---|---|---|---|
| 33½¢ a hundred between customers at | Decatur and Chicago |
| 27½¢ " " " " | " Kansas City and Chicago |
| 25½¢ " " " " | " Dallas and Chicago |
| 24¢ " " " " | " Sioux City and Chicago |
| 20½¢ " " " " | " Little Rock and Chicago |
| 20¢ " " " " | " St. Louis and Chicago |
| 19½¢ " " " " | " St. Joseph, Missouri, and Chicago |
| 18¢ " " " " | " Shreveport and Chicago |

If the freight rate from Decatur were reduced while the rate at Chicago remained the same, the benefit of the freight reduction would be withheld from the customers and be added to the price of the commodity. If the freight from Decatur were increased and the rate from Chicago were increased still more, the price to the purchaser would be raised by the amount of the increase in the Chicago freight rate. If the rate from Decatur were reduced and the rate from Chicago were increased, the customers would not get the benefit of the reduced rate from Decatur but would have to pay the increased rate from Chicago. Such are the discriminations which the Commission found to exist in the application of the basing point principle, as employed by the companies.

The Commission also found that the petitioners' use of the "booking" practice resulted in discriminations which occurred by:

1. Permitting favored customers to take delivery at the old price long after the expiration of the thirty-day period within which all customers were supposed to exercise their option of converting their bookings into actual sales.

2. Converting into sales at the old price bookings made by salesmen without authorization of the customer, in anticipation of the increased price.

3. Selling favored customers at the old price where no bookings were even claimed to have been made and long after the period within which all customers were supposed to have indicated whether they desired to take advantage of the booking privilege.

4. Delivering glucose in tank wagons at old tank car prices plus an additional delivery charge to buyers who had booked glucose for delivery in tank cars, although the buyers had no facilities for tank car delivery, where delivery was made long after a higher tank car price had become effective for other buyers.

The amount of the discriminations against small buyers growing out of the booking practice ranged from 30¢ to 55¢ a hundredweight or from 15% to 25% of the purchase price. These discriminations the Commission found to be such as "may be substantially to lessen competition or tend to create a monopoly * * *."

There was substantial evidence in the record to warrant the finding of the Commission that these basing point and booking practices of the companies were discriminatory. In our opinion of May 10, 1943, we stated that, even though there had been a finding that these discriminations tended substantially to lessen competition or create a monopoly, there was no evidence in the record to support such a finding. On further consideration and study, we think that that statement was unwarranted. A consideration of the stipulation concerning the effect of these practices[2] makes it

[2] It was stipulated that the basing point practice had the following effect on competition among candy manufacturers:

"That the higher prices paid for such syrup by such candy manufacturers located as aforesaid other than in the City of Chicago, Illinois, contribute to a greater or lesser degree in their having higher raw material costs than those candy manufacturers located in Chicago, Illinois, the degree in each instance depending upon the difference in price and the proportion of such syrup used in the candies manufactured;

*    *    *    *    *    *    *

"That the lower profits of these candy manufacturers paying higher prices for such syrup diminishes their incentive or desire to compete with those candy manufacturers paying the lower prices for such syrup and may deter potential new

apparent that there was substantial · evidence in the record to support the Commission's finding on this second essential to the cause of action.

However, we do not find it necessary to decide whether or not the so-called basing point system is legal or illegal. The Commission found that as employed by the petitioners, it produced discriminations and these discriminations were such as may be "substantially to lessen competition or tend clear, therefore, that a prima facie case of to create a monopoly * * *." It is clear, therefore, that a prima facie case of unlawful discrimination was made out. These same practices have been condemned as discriminatory in an opinion by us this day in Corn Products Refining Co. v. Federal Trade Commission, 144 F.2d 211. While both cases agree that the pricing under the basing point and booking practices was discriminatory, the companies in the present case present a defense not considered in the Corn Products Refining Co. case.

The companies take the position that notwithstanding that a prima facie case may have been made out, they are entitled under Section 2(b) of the statute to rebut this prima facie case, if they could, by showing that their "lower price * * * was made in good faith to meet an equally low price of a competitor. * * *" 15 U.S.C.A. § 13(b).

It is stipulated that the A. E. Staley Manufacturing Company went into business in Decatur, Illinois, in 1920. They soon discovered that they could make as good glucose as their competitors but that its quality was not so superior to competitors' as to command the market and that business could be had only by meeting competitors' prices. ·The company "sold such syrup at the same delivered prices as were quoted by competitors in the markets and at the destinations set forth" in the evidence. Their chief competitors and the largest corn syrup market in the country were in Chicago. They "found that * * * large factories were manufacturing such syrup and delivering it in Chicago at prices which were lower than those prices then existing in any other market; that the delivered price in such other markets was generally equal to the Chicago delivered price plus the published freight

rate on such syrup from Chicago to destination."

So, at the time the companies entered the business, their competitors were using the so-called basing point system. The prices they made conformed largely to that system. For the companies to get into the Chicago market under that system, they had to absorb the freight from Decatur to Chicago. The bulk of their business was in the Chicago market and their product was sold at a price to meet competitors' lower price in Chicago.

The petitioners claimed that in order to meet the competitive situation, they adopted the basing point price system in good faith, and later the so-called "booking" practice. The Commission found, however, that the companies "have not shown that the discriminations in price granted by them are within any of the excepting provisions of the statute." The Commission seeks to support this finding upon the following stipulation:

"That on several occasions, and since June 19, 1936, Respondents have increased and reduced their price per hundredweight for Corn Syrup for delivery in all markets by the same amount per hundredweight without and independent of any similar and prior action by competitors."

We do not think this is substantial evidence or that there is any other substantial evidence in the record to support the Commission's finding. The basing point practice was being used by their competitors when the A. E. Staley Manufacturing Company went into business. The booking practice developed as the business went along. The evidence in support of these facts is stipulated in the record and is not in dispute.

The stipulation above quoted does not say that such increases or .reductions of prices were related to the discriminatory practices with which the companies are charged. For aught that appears in that stipulation, such increases and reductions may have had nothing to do with the discriminatory practices of which the companies were found guilty. Certainly one cannot say that the booking practice discriminations were shown to be related to those independent price changes. Even if it may be inferred that all prices were pro-

---

candy manufacturers from entering the industry in cities where they would pay the higher syrup costs."

As to the mixed table syrup producers, the stipulation was essentially the same.

mulgated by use of the basing point system so that the price-changing mentioned in the above stipulation should be considered within the basing point practice, still § 2(b) of the statute does not require that competitors' prices shall be first announced and promulgated before one may in good faith meet them. The companies may very well have known what the competitive situation in their industry was and what was certain to happen. In anticipation of what their competitors were certain to do, the companies promulgated prices to meet the foreseen competitive situation.

The fact that the companies were first in the field with a price is not controlling. The question here is: Were they first in the field to use the basing point pricing system? It is the use of the system that is complained of. The evidence and stipulations are all to the contrary. The companies' competitors were using the system when the companies entered the field. The companies merely followed the system and practices which had been established by their competitors. That this was done in good faith is not questioned in the evidence.

We think the prima facie case made out by the Commission has been rebutted by the showing made by the companies and, since there is no substantial evidence to the contrary, we would not be warranted in enforcing the Commission's order. The order to cease and desist is vacated and the Commission is ordered to dismiss the complaint.

EVANS, Circuit Judge (dissenting).

I agree with the majority opinion when it states that the evidence supports the Commission's finding that the basing-point system as practiced by the A. E. Staley Manufacturing Company was discriminatory and worked to substantially lessen competition and tended to create a monopoly. Such a finding, supported by substantial evidence, necessitates our accepting it as a verity.

I can not follow the majority opinion, however, when it holds that the case made out by the Commission was rebutted by the petitioners. We part over the effect of petitioners' effort to bring themselves within the exception found in Subsection (a) of Section 2 of the Clayton Act as amended by the Robinson-Patman Act, 15 U.S.C.A. § 13(a). That section condemns and makes unlawful discriminations in prices which "may be substantially to lessen competition or tend to create a monopoly in any line of commerce."

The Commission having made a finding supported by substantial evidence and approved by this court that such practice was indulged in, there would be nothing left to this case, were it not for subsection (b) of the same section 13, which places upon the party practicing discrimination the burden of affirmatively showing justification.

The language of the statute, as amended, is,—"Nothing contained in sections 12, 13, 14–21, 22–27 of this title shall prevent a seller rebutting the prima-facie case thus made *by showing that his lower price* * * * was made *in good faith* to meet an *equally low price of a competitor* * * *."

In an effort to determine whether petitioners have established the justification permitted by the statute, it is worthy of note,

First, that such justification is limited to cases where the seller is attempting to justify "his *lower* price." In the instant case there is no attempt to show Staley was trying to justify a *lower* price. The most that the evidence shows is that Staley attempted to enter the field by complying with the existing basing-point practice. In short, Staley did not want "to stir up the animals" by starting a price war. He accepted the status quo,—a status quo which followed a practice which "substantially lessened competition and tended to create a monopoly," and which was, no doubt, satisfactory to one about to enter the field. But the satisfaction was not over the fact that it was to be permitted to "lower prices," but over the fact that said practice tended to lessen competition.

I can find nothing that would justify the conclusion that Staley indulged in its practice to justify a lower price.

Second. Likewise, worthy of note is the requirement of the statutory justification that the seller's "lower price" was to meet an "equally low price" of a competitor. There is nothing to show that the practice was adopted to meet "an equally low price" of a competitor.

If Staley's practice were limited to sales in Chicago, there could be a conceivable case of competition and a price fixing by Staley to meet the competition of Corn Products Company. But there is no show-

ing that Corn Products Company was maintaining a low price. Nor could it be said that the adoption of the basing-point system resulted in either a lower price for the seller or "a low price" of the competitor.

There might be, in my opinion, some justification for saying that Staley adopted the price fixed by the competitors and the competitors' basing-point system in order to prevent a competitive war in the industry which it was about to enter. It continued to maintain that price, not because it was a "lower price" but because the system was profitable and therefore satisfactory to those engaged therein.

Third. Nor can I believe that good faith, as that term is used in the statute, would ever apply to, or justify, a practice by a seller which produced a discrimination of such character as to substantially lessen competition and tend to create a monopoly as here found.

Good faith can not be ascribed to a seller who adds a freight charge to the selling price when there was no freight charge. It is utterly inconceivable that Staley could charge a customer a price which included a freight item from Chicago to Decatur, when no shipment was ever made by Staley, and delivery was to a customer in Decatur, where Staley's plant is located, and then assert that said practice was to justify a *lower* price and to meet the equally low price of a (Chicago) competitor.

We are here dealing with an attempted legal justification of a practice which substantially lessened competition and tended to create a monopoly. The only justification which the law permits is limited to the instance where the seller lowered its price to meet an equally low price of a competitor. Staley failed to bring itself within the protection of the statute in three respects: (a) Its action was not to justify its "lower price." (b) Its acceptance of the practice was not "to meet an equally low price of a competitor." (c) It was not, and could not be, made "in good faith" when the result of it was to "substantially lessen competition and tended to create a monopoly."

In the concurring-dissenting opinion of Judge MAJOR, it is said, "I agree that the strict literal language of Section 2(a) makes it appear that the system has been proscribed, but at the same time I am even more certain that it was not the intention or purpose of Congress so to do." In other words, Congress did not mean what it said. The court does not like the language of the statute as written so rewrites it.

With one part of the above-quoted sentence, to-wit, "the strict literal language of Section 2 (a) makes it appear that the system has been proscribed," I agree. We are, in other words, in accord on the proposition that the plus freight charge system is included in that which is proscribed.

What I can not agree to is that while Congress said so, it did not mean or intend what it said. Nor could I agree that if I were convinced that Congress did not intend what it said, courts could justifiably rewrite a statute to say what the courts believed Congress intended to say. If we were to so construe statutes, the courts, rather than the Congress would become the law making body.

Courts can and do go far in seeking intent, when the language used is ambiguous or uncertain and there is doubt as to the meaning of words. Courts then study the purpose of the legislation. In the case before us, there is no ambiguity nor uncertainty. And, instead of construing the language to carry out the intent of Congress to prevent unfair trade practices the proposed construction would tie the hands of the F. T. C. and prevent it from performing its duty to keep open all the lanes of commerce to all who wish to use them. It would defeat, or at least handicap, the F. T. C.'s effort to protect the public against practices which the Commission has found (and we approve the finding) "substantially lessened competition" and tended "to create a monopoly."

The purpose of the legislation embodied in the Clayton Act, as amended by the Robinson-Patman Act, is now so clear and obvious that debate or discussion is idle. We are dealing with unfair trade practices. Such condemned practices include those which result in "substantially lessening competition" or which "tend to create a monopoly." Unfair trade methods also include other bad practices, like misrepresentation of quality of goods, false and misleading advertisement, and fraudulent practices in general. In a word, the Act was passed to protect the public against the practices which the avaricious might inflict on an innocent or gullible public. The legislation did not define all the specific kinds of commerce which were subject to its provision. It used all inclusive language. The only limitation is that the commerce must be interstate.

As in the recently decided case of United States v. South-Eastern Underwriters Ass'n, 64 S.Ct. 1162, the question is one where Congress has spoken and courts are asked to make an exception to the inclusion of its broad language where no such exception appears in the statute.

In United States v. South-Eastern Underwriters Ass'n, 64 S.Ct. 1162, the Justices agreed that insurance business was commerce. Division in the Court occurred over whether that phase of commerce represented by insurance was excepted from the inclusive language of the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note. The Court held that the Act covered all commerce and therefore commerce represented by insurance could not be exempted.

In the case before us, we have even stronger reason for concluding that the Congressional Act did not except the practice here under consideration. In the instant case, petitioners must bring themselves within the language of the exception. The fact that one exception is stated in the Act excludes all other exceptions. We are not justified in adding other instances as exceptions. To come within this single exception, petitioners must show that their practices, which tended to lessen competition and to create a monopoly, were justified because they met an unusual situation,—in other words, that it was necessary to lower prices—in good faith,—to meet equally low prices of a competitor. There is no other exception. Either petitioners come within this exception, or they fail in their defense.

To even contend that such was the justification of the practice in question, strikes me as bordering on the absurd. No lower price by either party was contemplated. Good faith, a term often stretched to the breaking point, has never before been held to sustain a practice which lessened competition and tended to create a monopoly. "Good faith"—a term for the hard-pressed wrongdoer to conjure with, a term which protects the innocent from the consequences of his mistake, also a term behind which the insincere attempt to hide—would be given a false application if it covered the act of those seeking to monopolize an industry. Faced by many a decision, one of which was recently announced by this court (Eugene Dietzgen Co. v. Federal Trade Commission, 7 Cir., 142 F.2d 321), we must hold that action which lessens competition or tends to create a mo-

nopoly is unfair within the meaning of the Federal Trade Commission Act, 15 U.S.C. A. § 41 et seq., and good faith, as that term is used in the above-quoted exception found in the Robinson-Patman Act, cannot be ascribed to those who indulge in such practice. Such a construction would run counter to the Sherman Anti-Trust Act, the Clayton Act, and the Federal Trade Commission Act. We cannot justifiably hold that by implication the Robinson-Patman Act repealed or changed this Congressional policy so long established. If the change is to be made, Congress, not the courts, must do it.

The order of the Commission should be affirmed and enforced.

MAJOR, Circuit Judge (concurring in part and dissenting in part).

■ I concur in the result reached by Judge MINTON, that is, that the Commission's petition for enforcement of its order should be denied. Neither do I take issue with the basis for his conclusion that petitioners' price "was made in good faith to meet an equally low price of a competitor" under § 2(b). However, in my view there is no occasion to decide the merits of such defense for the reason that the Commission has failed to make a case of price discrimination under § 2(a).

I disagree with the statement, "we do not find it necessary to decide whether or not the so-called basing point system is legal or illegal." In my view, the opinion is a holding that the price system is illegal. Notwithstanding respondent's apparent reluctance to meet this issue head on, it is squarely presented by its cease and desist order. The sole factual situation relied upon to show a "discrimination in price between different purchasers" is that petitioners sold at a delivered price of Chicago plus freight to the point of delivery, irrespective of whether the freight rate from Decatur (the location of petitioners' plant) was greater or less than that from Chicago. I am unable to discern how it can be said in one breath that the legality of such a system is not at issue and in the next that its use is violative of § 2(a).

It should be kept in mind that respondent's complaint is based solely on an alleged violation of § 2 of the Clayton Act, as amended by the Robinson-Patman Act approved June 19, 1936, and we are therefore not concerned with a case which might be predicated upon some other provision of

the anti-trust laws. No contention is made that petitioners were in agreement with their competitors in their adoption of a delivered price system. On this ground alone, much of respondent's argument becomes irrelevant.

The basing point system has been widely employed by industry in this country for more than fifty years (Harvard Law Review 45, page 548, footnote), and notwithstanding respondent's assertion to the contrary, I think a court may and should take judicial notice of a system of such long and extensive use. Furthermore, we may take judicial notice of the fact that various agencies of the federal government by administrative orders and decrees have given recognition to the system. Salt Producers Ass'n v. Federal Trade Commission, 7 Cir., 134 F.2d 354, 358; Gay Union Corp., Inc., v. Wallace, 71 App.D.C. 382, 112 F.2d 192, 195; Benton Harbor-St. J. G. & F. Co. v. Middle West Coal Company, 6 Cir., 271 F. 216, 218. The Supreme Court, in Cement Mfrs' Protective Ass'n v. United States, 268 U.S. 588, 598, 45 S.Ct. 586, 589, 69 L.Ed. 1104 (decided in 1925), said of the system:

"Their use is rather the natural result of the development of the business within certain defined geographical areas. * * * the basing point is an essential element in making a delivered price, since selling by any particular manufacturer at the lowest of the delivered prices computed from several basing points is a necessary procedure in competing in the sale of cement."

Petitioners contend that use of the basing system is not proscribed by § 2, and rely strongly upon the legislative history made at the time of the passage of the Robinson-Patman amendment. On the other hand, respondent contends that the legislative history is irrelevant for the reason that the basing system had no legal standing at any time and the most that can be said from the legislative history is that Congress did not intend to alter its status, that if it was legal before the amendment it was legal afterward, and if illegal before it was likewise illegal afterward. It may be, as respondent contends, that the legality of the system has never been established. Assuming that such is the case, I still think that the Commission carries a heavy burden in attempting to demonstrate that the system has been outlawed, in view of its extensive use in industry over such a long period of time, its recognition by numerous agencies of the government, its limited approval by the Supreme Court, and the emphatic refusal of Congress by express language to outlaw it, although often urged so to do. Furthermore, I am of the view that the legislative history of the instant amendment, together with related proceedings before Congress, amount to an implied recognition of its legality.

I agree that the strict literal language of § 2(a) makes it appear that the system has been proscribed, but at the same time I am even more certain that it was not the intention or purpose of Congress so to do. I also agree that a superficial view of the system is calculated to lead to its condemnation. If it were within the province of this court to appraise the system, which it is not, we are in a poor position to do so from the record before us. It must be assumed, I think, that it is a two sided question; otherwise, repeated action to outlaw it would not have met with such potent, continued and successful opposition in Congress. Action with reference to a system so thoroughly embedded in the economic life of the country is a matter peculiarly within the legislative domain, and the responsibility should not be assumed by the courts unless compelled to do so by a statutory command which leaves no doubt as to the intention and purpose of Congress.

A mere recitation of the legislative history of the amendment under consideration, together with other pertinent facts relative thereto, leaves no room for doubt but that Congress did not intend to outlaw the basing system; in fact, its purpose to the contrary is clearly shown. Even though a literal reading of the Act as amended may lead to a contrary result, courts are not bound to accept such a meaning if inconsistent with the purpose and intent of its makers. In re Rector, etc., of Holy Trinity Church v. United States, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226; Takao Ozawa v. United States, 260 U.S. 178, 194, 43 S.Ct. 65, 67 L.Ed. 199.

In the recent important case of United States v. South-Eastern Underwriters' Ass'n et al., 64 S.Ct. 1162, 1175, the court held that the Sherman Anti-Trust Act was applicable to the defendant insurance companies. Surely it cannot be said that the Sherman Act is any less comprehensive or all inclusive in its terms than the language of the instant Act. Both the majority and

minority opinions in that case, however, rely upon the legislative history of the Act. In the majority opinion it is stated:

"But neither by reports nor by statements of the bill's sponsors or others was any purpose to exempt insurance companies revealed. * * * On the contrary, all the acceptable evidence points the other way. That Congress wanted to go to the utmost extent of its Constitutional power in restraining trust and monopoly agreements such as the indictment here charges admits of little, if any, doubt."

If the legislative history may be looked to for a construction of the Sherman Act, I see no reason why it should not be looked to in construing the Clayton Act as amended. In the case last cited, the Supreme Court found nothing in the legislative history of the former Act contrary to its plain unambiguous language, but the congressional history of the latter Act is clearly at variance with the construction sought by respondent.

The Robinson-Patman Act was reported by the House Judiciary Committee as H. R. 8442 of the 74th Congress, and contained the following definition of a "price":

"(5) The word 'price', as used in this section 2, shall be construed to mean the amount received by the vendor for each commodity unit, after deducting actual freight or cost of other transportation, if any, allowed or defrayed by the vendor."

The Committee report accompanying the bill expressly stated that the object of this definition was to eliminate the basing point or delivered price method of selling, and that the definition would require the use of f. o. b. method of sale (House Reports, 74th Congress, No. 2287). This definition was stricken by an amendment unanimously agreed to by the House (80 Cong.Rec. 8140, 8224). Representative Patman, one of the authors of the bill, in connection with this amendment conceded on the floor of the House that the anti-basing point provision had been eliminated from the bill and that it met with his approval. Representative Citron, a member of the House Judiciary Committee in charge of the bill, stated some of the reasons why the basing system should not be outlawed, and among other things said:

"There is an economic justification of this system, because it provides an open and above-board method for manufacturers and wholesalers to meet competition out-side of their own local freight area. * * * But a more serious consequence of the inclusion of this definition of price, as previously stated, would be to compel all manufacturers to ship f. o. b. shipping point, and therefore compel the very definite localization of operations of all manufacturers and wholesalers, which would have the immediate effect of increasing costs as the result of seriously limited volume production." (80 Cong.Rec. 8224.)

Without quoting further, it is sufficient to note that all members who participated in the House debate agreed that the inclusion of the definition of "price" as originally contained in the bill was directed at the basing point price system, and that the elimination of such definition was for the express purpose of removing the basing system from the proscriptions of the amendment. There was not a single discordant note to this view. It is true that some of the members criticized the system, but even those admitted it was a matter which should be given consideration in separate legislation. For instance, one member of the Committee stated, "I think the basing point practice indefensible and we should deal with it soon in a separate bill." When the bill was before the Senate, Senator Borah, in response to an inquiry by Senator Davis as to the effect the proposed legislation would have on the basing point sytem, stated "My opinion would be that this does not have any effect upon that. I defer to the judgment of the Senator in charge of the bill, but that would be my impression." Senator Van Nuys, who was in charge of the bill, then stated, "The Senator from Idaho is correct."

Notwithstanding this imposing legislative history, respondent argues that it is inconceivable that Congress intended to legalize this "indefensible" practice. To my mind this is a spurious contention. The legislative history leaves no room for doubt but that Congress purposely refrained from outlawing the system and by strong implication gave recognition to its existing legal status.

It is also significant that at the same session of Congress the Wheeler Anti-Basing Point Bill was rejected (80 Cong.Rec. 8102, 8223 and 8224). In 1936, hearings were held before the Senate Committee on Interstate Commerce, from March 9 to April 10, on Senate S. 4055, which was expressly aimed at eliminating the basing point system, and again no legislation re-

sulted. Also, it may be observed that the Temporary National Economic Committee created by joint resolution of Congress on recommendation of the President to study the entire problem of monopoly recommended in its final report the legislative destruction of the basing point system as a monopolistic price fixing device. (Senate Document No. 35, 77th Congress, 1st Session, page 33.) It is also interesting to note that the Assistant Chief Counsel for the Commission who argued the instant case before this court, on January 30, 1940 urged the Committee to "consider whether legislation outlawing the basing point system would be recommended." It was his position then that the system could be reached only under "theories of conspiracy and concerted action which are necessary to make the law applicable." (Record of proceedings of T. N. E. C., Vol. 4, page 400.) Cf. Federal Trade Commission v. Bunte Brothers, Inc., 312 U.S. 349, 352, 61 S.Ct. 580, 85 L.Ed. 881.

All of which shows that not only has Congress refused in no uncertain terms to outlaw the system, but that the Commission has recognized its use as not unlawful except in combination or concerted action. Can it be possible that Congress in the enactment of the Robinson-Patman amendment proscribed the use of the basing system after its clearly expressed intention and purpose to the contrary? I am unwilling to attribute to Congress such a degree of mediocrity. Is it reasonable to suppose that the Commission and its counsel would have continued to urge legislation outlawing the system if such was already an accomplished fact? The plain unvarnished truth is that respondent seeks from this court that which Congress has steadfastly denied.

Respondent relies upon another crutch which furnishes little, if any, support. In 1924, in Federal Trade Commission v. United States Steel Corp. et al., 8 F. T. C. 1, it held that the basing point system was illegal under the Clayton Act prior to the passage of the Robinson-Patman amendment. A cease and desist order was issued but, as I understand, no action has been taken by the Commission to enforce its order and the Steel Corporation continues to use this price system or one of the same principle. It is a fair inference in the light of what has since transpired that the Commission entertained no hope that such an order was enforceable under the old

Clayton Act, and in view of the legislative history of the Robinson-Patman amendment and other related events, it has little, if any, basis for such hope at this time.

Another factor of some importance is the alternative price system open to petitioners. Of course, I assume it is not within the province of courts or respondent to advise petitioners or anybody else how a business should be operated so as to comply with the law. However, in the instant case, respondent's order requires that petitioners within sixty days file with the Commission a report in writing setting forth "in detail the manner and form in which they have complied with this order." That means, so I would think, that petitioners must advise the Commission of the price system they have adopted in lieu of that which is condemned. Respondent in its reply brief, in response to petitioners' challenge that it describe a price system which would be nondiscriminatory, makes this pertinent suggestion, "But petitioners obviously do not want one pricing method that rather clearly would not be discriminatory, a uniform f. o. b. plant price with exceptions based only on differences in cost." This suggestion no doubt presents the only alternative to the price system now under attack. At any rate, so far as I know, it is the only system which on principle could be distinguished from the basing point system. The f. o. b., or mill price system as it is sometimes called, is the very system which Congress has refused to impose upon industry for the reason that it would cause or tend to cause the centralization of industry in the more highly populated centers. See Representative Citron's remarks (80 Cong.Rec. 8224).

This court in its former opinion expressed the view that there was no evidence in the record to support the finding that the discrimination shown tended substantially to lessen competition or to create a monopoly. I am not convinced that we were in error in this respect. In my view, the basing point system has the opposite effect, that is, it has a tendency to preserve competition and prevent monopoly. Especially is this so when compared with the f. o. b. system now sought to be imposed. It was stipulated in effect that the quality of syrup manufactured by petitioners and all competitors was substantially the same, that petitioners could not sell at a higher price than their competitors, and that competitors could not sell at a higher price

than petitioners. To me this means that petitioners and their competitors must sell their product at substantially the same price. Petitioners, forced to an f. o. b. price, could not compete with their competitors in the Chicago market any more than their Chicago competitors could compete with them in the area immediately surrounding Decatur. Competition might become a thing of the past, and each manufacturer have a monopoly of the trade in its own area. Other things being equal, and there is nothing in this record to the contrary, such a price system in my judgment would be calculated to lead to a price war from which only the financially strong and those with a favorable geographical location could survive. Such is the unreasonable result which the Commission would have us produce by embracing its construction of the Clayton Act as amended.

I would refuse such construction and leave the matter in the lap of the legislative branch of the government where in my view, it properly belongs.