UNITED STATES ex rel. SOLLANO v.
DOAK, Commissioner of Labor, et al.

District Court, N. D. New York.
Jan. 24, 1933.

Oliver D. Burden, U. S. Atty., of Syracuse, N. Y. (Roger O. Baldwin, Asst. U. S. Atty., of Syracuse, N. Y., of counsel), for the United States.

Wm. Rosenzweig, of New York City, for petitioner.

COOPER, District Judge.

This is a writ of habeas corpus issued on the petition of Antonino Sollano, on behalf of his son, Salvator Sollano.

Salvator Sollano, a native of Italy, lawfully entered the United States as an immigrant on May 17, 1921, at Boston, Mass. He has never been admitted to citizenship.

On April 14, 1925, he was convicted in the state of New York of the crime of manslaughter in the first degree and sentenced to serve a term of ten to twenty years in a New York state prison.

On December 6, 1927, the commissioner of labor issued his order to take the alien into custody and granted him a hearing to enable him to show cause why he should not be deported.

After such hearing and on February 4, 1928, the secretary of labor issued a warrant for his deportation effective upon his release from prison.

On or about the 29th day of August, 1932, the alien was released on parole by the parole board of the state of New York and on the same day arrested under the deportation warrant and confined in the Rensselaer county jail in Troy, N. Y., when the writ was issued.

Authority for deportation, if the alien were not on parole by state authority, is found in section 155 of title 8 USCA, providing that an alien is subject to deportation if convicted of a crime involving moral turpitude committed within five years of the entry upon which sentence of more than one year is imposed.

The secretary of labor contends that the crime of manslaughter in the first degree involves moral turpitude and that under section 3 of the Act of March 4th, 1929, 8 US

CA, 180b, the alien is subject to immediate deportation despite the parole.

Section 3 reads as follows:

"Sec. 3. An alien sentenced to imprisonment shall not be deported under any provision of law until after the termination of the imprisonment. For the purposes of this section the imprisonment shall be considered as terminated upon the release of the alien from confinement, whether or not he is subject to rearrest or further confinement in respect to the same offense."

■ The alien resists deportation on the following grounds:

(1) That even if manslaughter in the first degree does involve moral turpitude, section 3 of the Act of March 4, 1929, does not apply to him but only to persons convicted under other sections of the same act of re-entering, or attempting to re-enter, after previous deportation or rejection, and that there is no law for his deportation prior to the expiration of his sentence; (2) that the crime of manslaughter in the first degree does not involve moral turpitude.

Section 3 of the Act of March 4, 1929 (8 USCA § 180b), has been held by the Circuit Court of Appeals in the Second Circuit to apply to an alien convicted under state law and under federal law other than the Act of March 4, 1929. This was held in United States ex rel. Feuer v. Day (D. C.) 42 F. (2d) 127, decided May 5, 1930, and is controlling on this court, even if it were disposed to agree with the argument of counsel for the alien here, and it is not.

A brief reference to such argument may show its fallacy.

■ Counsel for the alien here emphasizes that the Act of March 4, 1929 (45 Stat. 551, see 8 USCA §§ 136, 154, 180, 180a to 180d), is entitled:

"An Act Making it a felony with penalty for certain aliens to enter the United States of America under certain conditions in violation of law."

He argues that all parts of the act must relate to the subjects set forth in the title and, therefore, section 3 must be held to relate only to aliens defined in the act; viz., those who attempt to re-enter after previous deportation and that, since the alien is not one of these, section 3 does not apply to him.

Section 1 relates to such aliens and also amends sections 3 and 18 of the Immigration Act of 1917 (8 USCA § 136 (J) and section 154. Section 4 provides a penalty for violations of the Act of March 4, 1929. But section 2 (8 USCA § 180a) defines new crimes which an alien may commit upon seeking unlawfully to enter the United States; such as entering the United States at a time or place other than as designated by the immigration officials, eluding inspection, or obtaining admission by willful misstatement or suppression of a material fact, and is in no wise confined to aliens previously deported or rejected.

Section 3 above quoted relates solely to deportation of aliens who have been paroled and likewise is not confined to aliens who have been deported or rejected.

Section 3 defines no crime and defines no penalty for anything whatever. It is not a penal statute and deportation statutes are not of a criminal nature.

The alien also lays stress upon the words in section 3, "For the purposes of this section the imprisonment shall be considered as terminated upon the release of the alien from confinement, * * *" as confining the application to the aliens described in the title and in section 1 of the act.

This was merely a limiting phrase to make sure that the section could not be construed as releasing the alien from his parole obligations for any purpose other than deportation. Otherwise it might be construed as releasing him from all parole obligations. He might successfully resist deportation and then be free from parole entirely.

That all sections of the act do not apply to precisely the subject stated in the title and referred to sections 1 and 4 (8 USCA §§ 136j, 154 and 180c), viz., aliens re-entering who had been previously deported, may be conceded, but that does not render invalid any of its parts or confine them to precisely the same subject-matter of the title or of sections 1 and 4 (8 USCA §§ 136j, 154 and § 180c) thereof. All sections relate to the general subject of aliens, which is the subject-matter of the act. The case of Church of Holy Trinity v. U. S., 143 U. S. 457, 12 S. Ct. 511, 36 L. Ed. 226, upon which the alien relies, does not apply.

That case would have application if there were ambiguity of meaning in section 3, but there is no uncertainty.

In support of his argument that section 3 of the Act of March 4, 1929, is not applicable to him, the alien also urges that the Act of March 2, 1931, amending the act, entitled "An Act To amend an Act to parole United States prisoners, and for other purposes, ap-

proved June 25, 1910," clearly indicates that the Act of March 4, 1929, relates only to aliens coming under that act. This act of March 2, 1931, amends section 3 of the Act of 1910 (18 USCA § 716), by adding at the end thereof the following:

"Provided, That where a Federal prisoner is an alien and subject to deportation, the board of parole may authorize the release of such prisoner after he shall have become eligible for parole on condition that he be deported and remain outside of the United States and all places subject to its jurisdiction, and upon such parole becoming effective, said prisoner shall be delivered to the duly authorized immigration official for deportation."

The alien says the very enactment of this act is shown by the request of the Attorney General for its passage and by committee reports in the Senate and House favorably reporting the bill for passage, to have been asked upon the assumption that there was in 1931, no existing law which would permit federal paroled prisoners to be deported.

The argument is that, if section 3 of the Act of 1929 covers the deportation of all aliens released on parole, then there was no need of the Act of March 2, 1931, and the Attorney General and the House and Senate Committee were singularly ignorant of the law in asserting that the Act of March 2, 1931, was necessary to permit the deportation of alien federal prisoners released on parole. Hence, says the alien, since the Act of March 21, 1931, was declared necessary for such purpose by such official and committee, it follows that section 3 of the Act of 1929 does not apply to the same subject-matter and does apply only to such alien prisoners as were convicted of violating the other provisions of the Act of 1929, and the alien at bar is not such alien.

It is clear that the amending Act of March 2, 1931, relates only to federal prisoners. Section 3 of the Act of 1910 (18 USCA § 716) is a part of the Criminal Code of the United States and relates to the parole board of the department of justice. Before the amendment it provided and still provides for the parole of federal prisoners. Such prisoners might, under the discretion of the federal parole board, be paroled upon such terms and conditions as the board should prescribe and were required "to remain, while on parole, in the legal custody and under the control of the warden of such prison from which paroled, and until the expiration of the term or terms specified in his sentence

* * * and the said board shall, in every parole, fix the limits of the residence of the person paroled. * * *"

Section 4 of the Act of 1910 (18 USCA § 717) provides that upon belief that parole has been violated, the warden may issue his warrant and retake the prisoner.

It will thus be seen that a strict compliance with the terms of this section before the Acts of March 4, 1929, and March 2, 1931, would prevent the deportation of deportable federal prisoners until the expiration of the term of his parole, for manifestly the power and authority of the parole board and of the warden cannot extend beyond the confines of the United States and their territories.

The Act of March 4, 1929, runs to the department of labor both expressly and for the reason that deportation of aliens, criminal or otherwise, is within the jurisdiction of that department.

This Act of March 4, 1929, does not purport to amend, nor does it refer to section 3 of the Act of 1910 aforesaid. Nor is it limited to state prisoners, but by its terms it evidently covers all deportable alien prisoners.

It related also, only to aliens already on parole. There was, however, uncertainty, whether or not it affected or modified the parole powers of the federal parole board under section 3 of the Act of 1910.

It was evidently to rid the parole boards of this uncertainty and to make sure that they could parole federal alien prisoners and secure their immediate deportation by the labor department, that the Act of March 2, 1931, was passed.

With such enlarged power, the parole board would be able to parole deportable alien federal prisoners as soon as permittable and not have to withhold such parole because of uncertainty of whether or not such aliens would be deported by the immigration department or could be found by that department for deportation after parole, or could be deported at all before the expiration of their terms.

Before the Act of March 4, 1929, the labor department could not deport prisoners on parole because section 19 of the Immigration Law of February 5, 1917 (8 USCA § 155) relating to the deportation of aliens says in part, "Nor shall any alien convicted as aforesaid be deported until after the termination of his imprisonment."

This provision of section 19 was a com-

plete bar to the deportation of any prisoners, state or federal, until the termination of their sentences, which meant the expiration of the time for which they had been sentenced, regardless of parole.

Such was held in the 9th Circuit in Nagle v. Lim Foon (C. C. A.) 48 F.(2d) 51. Though this case was decided on March 16, 1931, after the passage of the Act of March 4, 1929, that act was not called to the attention of the court and was undoubtedly unknown to them, since it was not mentioned in the opinion.

Since the Act of March 4, 1929, deportable alien state prisoners may be deported immediately upon parole. Whatever doubt there was as to the deportation of deportable alien federal prisoners has been dispelled by the Act of March 21, 1931.

▮ The two acts are not inconsistent. They cover different fields. One is confined to federal prisoners and runs to the parole board; the other relates to the labor department and covers deportable alien state prisoners, at least.

Since they do not cover the same field, the later act cannot by implication repeal the earlier act. Even if there were inconsistency as to federal prisoners, there is no inconsistency between the two acts so far as alien state prisoners are concerned. The alien is a state prisoner and not affected in any way by the Act of March 2, 1931. He cannot be heard to complain as to the scope or effect of that act so long as there remains law applicable to him warranting his deportation, as there is.

The Act of March 2, 1931, was passed after the decision in 1930 of U. S. ex rel. Feuer v. Day (D. C.) 42 F.(2d) 127, supra, but that does not impair the application of that court's construction of the Act of March 4, 1929, to a deportable alien state prisoner, paroled after 1931.

The alien then is immediately deportable if the crime of which he was convicted involves moral turpitude.

▮ Manslaughter in the first degree is defined in section 1050 of the Penal Law of the state of New York (Consol. Laws N. Y. c. 40), so far as applicable here, as follows:

"Manslaughter in first degree. Such homicide is manslaughter in the first degree, when committed without a design to effect death: * * * 2. In the heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon."

It is admitted in the record that the alien shot his father-in-law with a revolver while in the heat of passion and, doubtless, as the result of a quarrel.

The Circuit Court of Appeals in the Second Circuit has held that the crime of manslaughter in the first degree involves moral turpitude, in the case of United States ex rel. Allessio v. Day, 42 F.(2d) 217.

The facts in that case show that the alien was convicted of manslaughter in the first degree, but it is not stated in what state he was convicted. He was also convicted in New Jersey of the crime of counterfeiting, which was, of course, a federal crime.

The court did not discuss the crime of manslaughter in the first degree, but stated, with reference to both crimes: "The crimes for which he was convicted involved moral turpitude."

In Pillisz v. Smith, 46 F.(2d) 769 (C. C. A. 7), the court held that manslaughter was a crime involving moral turpitude. The crime was committed in Hungary where the law did not divide the crime of manslaughter into degrees. But that is unimportant.

In any event, the court held moral turpitude involved. The facts have much similarity to those in the case at bar.

The alien relies to some extent upon U. S. ex rel. Mongiovi v. Karnuth (D. C.) 30 F. (2d) 825. In that case the court held that manslaughter in the second degree did not involve moral turpitude. But there is a broad distinction between the two degrees of manslaughter.

As has been seen, first degree manslaughter is homicide "in the heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon."

In the second degree, the corresponding definition is:

"In the heat of passion, but not by a dangerous weapon or by the use of means either cruel or unusual." (Penal Law § 1052).

This case has no application here.

The crime of assault is a less serious crime than manslaughter. That assault with a dangerous weapon involves moral turpitude was held in U. S. ex rel. Morlacci v. Smith (D. C.) 8 F.(2d) 663; Weedin v. Tayokichi Yamada, 4 F.(2d) 455 (C. C. A. 9, 1925).

The alien stresses the language of the definition of manslaughter as excluding intent. Absence of intent necessarily implies absence of moral turpitude, argues the alien.

The only intent lacking in manslaughter in the first degree is intent to effect death. Had there been intent to kill, it would not have been manslaughter in the first degree but murder. The lack of such an intent does not mean lack of an intent to inflict grievous bodily harm or lack of intent to injure or such lack of intent as to negative moral depravity. If the dangerous weapon is used solely in self-defense without the use of excessive force and under circumstances which justified the use of the weapon, no crime at all would be committed. The conviction, however, negatives all elements of self-defense.

But one who uses a dangerous weapon like a revolver, not in self-defense but in such a way as to cause the death of another, must be held so lacking in sense of moral responsibility as to be morally depraved and his act to be one involving moral turpitude.

Both upon reason and authority, the crime of manslaughter in the first degree involves moral turpitude.

The writ must be dismissed and the alien remanded to the custody of the immigration authorities for deportation and an order may be entered accordingly.