VIDAL Y PLANAS v. LANDON, District Director, Los Angeles District Immigration and Naturalization Service.

No. 13459.

United States District Court
S. D. California, C. D.

April 3, 1952.

United States of America on November 26, 1938, being admitted at Tampa, Florida, as a visitor for four months. Plaintiff's permit and extensions thereof have expired, and as a result he is now in this country illegally.

It appears from the record before the Court that plaintiff was a distinguished writer and professor, with a broad cultural background and of excellent character. One, Luis Anton de Olmet, was a writer and a Congressman in Spain. Plaintiff herein described him as "a bully" and stated that de Olmet persuaded plaintiff to collaborate with him in writing a play. The play was written by the two men, but according to plaintiff de Olmet maintained a domineering, abusive attitude towards plaintiff, made many malicious remarks and statements about him and, generally, ran him down among his friends.

Plaintiff relates that one afternoon in the foyer of the Eslava Theatre in Madrid, de Olmet entered and proceeded to insult plaintiff. He attempted to choke plaintiff and attempted to break plaintiff's neck. Plaintiff was armed, having obtained a permit to carry a gun. He says that de Olmet was larger and stronger than he, and so to protect himself from the choking plaintiff shot de Olmet, without intending to kill him, but that subsequently de Olmet died as a result of the shooting.

Plaintiff was arrested and brought to trial. He says that he made demand for trial by jury but that during the regime of Primo de Rivera in Spain (during which this incident occurred) trial by jury had been dispensed with. Plaintiff was found guilty by the court, was sentenced to spend six to twelve years in prison and, in addition thereto, was ordered to pay costs of court and damages to the widow of de Olmet. Plaintiff alleges that because of his unjust conviction and public sentiment in his favor arising therefrom, he was pardoned. Sentence was imposed on May 21, 1924, and he was pardoned September 8, 1928.

Plaintiff states that when he was admitted to the United States as a temporary visitor for four months, he had no intention of remaining permanently. However, he sub-

Newman & Newman, Los Angeles, Cal., for plaintiff.

Walter S. Binns, U. S. Atty., Clyde C. Downing, Asst. U. S. Atty., Chief, Civil Division and Paul Magasin, Asst. U. S. Atty., all of Los Angeles, Cal., for defendant.

WESTOVER, District Judge.

Plaintiff herein is a native and national of Spain, having been born in that country on January 29, 1891. He came to the

sequently decided to stay in this country if possible. Numerous hearings have been held relative to his deportation. Several times plaintiff has been given the privilege of voluntary departure from the United States, with privilege of pre-examination for re-entry. However, plaintiff failed to avail himself of the privilege of voluntary departure, and finally on March 12, 1948, the Commissioner of Immigration and Naturalization, acting for the Attorney General, made an order that plaintiff be deported to Spain.

Plaintiff has endeavored through means of petitions and appeals to obtain an order allowing him to remain in this country and has exhausted every recourse available to him, except the courts. On September 7, 1951, he filed this complaint for declaratory judgment and for injunction and has asked this Court to find that the order of deportation issued by the government is illegal and without force and effect and, consequently, to permanently enjoin and restrain the government from deporting plaintiff.

On September 3, 1943, the immigration authorities found that plaintiff was subject to deportation on the ground that he had remained in the United States for a longer time than permitted; and also under Section 19 of the Act of February 5, 1917, 8 U.S.C.A. § 155, plaintiff was subject to deportation on the ground that he had been convicted of a felony, or other crime or misdemeanor involving moral turpitude, prior to entry into the United States.

Plaintiff readily admits he is deportable as a person who remained as a visitor longer than permitted by his entry document; but he was not advised nor permitted to file an application for any discretionary relief provided by Section 19(c) of the Act. Plaintiff now alleges in his complaint at bar that he should be permitted to file an application for discretionary relief, inasmuch as the findings of the immigration authorities that he was convicted of a felony, or other crime or misdemeanor involving moral turpitude, is based upon a mistake of fact; that the crime which plaintiff committed and for which he was sentenced was not a crime involving moral turpitude.

It appears that since his arrival in the United States plaintiff has been a law-abiding resident. He has not been a public charge and brought with him sufficient money to sustain himself until he could obtain employment. In July, 1943, he became a professor of Spanish at Fordham University, and in 1944 he came to Los Angeles, California, for the purpose of accepting employment with Warner Brothers Studios and was subsequently employed at a salary of $125 per week. At the present time plaintiff is employed, and there is no contention on the part of anyone that he will become a public charge.

Although deportation proceedings were commenced in 1943 and there have been many orders made by the immigration authorities relative to deportation, plaintiff has never been deported. The immigration authorities have recognized that this is an exceptional case. In November, 1945, the Assistant Commissioner found:

> "Inasmuch as it appears that if the respondent were deported he would be subject to persecution in Spain, it is believed that the discretion contained in the 7th Proviso to Section 3 of the Immigration Act of 1917 should be exercised in his behalf."

Again, in March, 1948, the Acting Commissioner found:

> "The factors in this case are extremely appealing. The respondent has resided in this country continuously since entry in 1938 and his conduct here appears to have been exemplary * * *.
>
> * * * * * *
>
> "Ordinarily, in view of the exceptionally meritorious aspects of this case, favorable consideration would be given to the application to extend the time for voluntary departure."

As heretofore stated, although the plaintiff was given every consideration by the immigration authorities and was privileged to depart the country voluntarily, nevertheless, he did not see fit to so depart, and as a consequence in March, 1948, a warrant of deportation was issued against the defendant on the grounds that he had remained in

the United States for a longer period than permitted under the Act or regulations made thereunder, and that he had been convicted of a felony, or other crime or misdemeanor involving moral turpitude, prior to entry into the United States, to-wit, homicide.

Plaintiff contends that the immigration authorities under the facts of the case have no right to find that the crime which was committed by plaintiff and under which he was sentenced was a crime involving moral turpitude. It has been plaintiff's contention that inasmuch as he was granted a pardon by the government of Spain, the pardon in effect wiped out the accusation, trial and conviction. However, it appears well established by the cases that the provision of the Act relating to pardons applies only to pardons granted in the United States for crimes committed here and does not apply to pardon of crimes committed prior to entry into the United States. Weedin v. Hempel, 9 Cir., 1928, 28 F.2d 603; Mercer v. Lence, 10 Cir., 1938, 96 F. 2d 122, certiorari denied, 1939, 305 U.S. 611, 59 S.Ct. 69, 83 L.Ed. 388; Palermo v. Smith, 2 Cir., 1927, 17 F.2d 534; Consola v. Karnuth 2 Cir., 1939, 108 F.2d 178.

Consequently, the issue before the Court at the present time is whether or not the crime of which plaintiff was accused, found guilty, and sentenced was a crime involving moral turpitude. The immigration authorities have consistently found in this case that the crime did involve moral turpitude. Unfortunately, there does not seem to be any definite interpretation of the term "moral turpitude." The assumption has been that the term "homicide" in itself includes moral turpitude.

In one of the earlier cases, U. S. ex rel. Mylius v. Uhl, D.C., 203 F. 152, at page 153, the Court said, in discussing the term "moral turpitude":

"In determining whether aliens are entitled to admission, the immigration authorities act in an administrative and not in a judicial capacity. They must follow definite standards and apply general rules. Consequently, in classifying offenses I think that they must designate as crimes involving moral turpitude those which in their inherent nature include it. * * * In my opinion when it has been shown that an immigrant has been convicted of a crime, the only duty of the administrative officials is to determine whether that crime should be classified as one involving moral turpitude, according to its nature and not according to the particular facts and circumstances accompanying a commission of it. I do not think the immigration law intends that where two aliens are shown to have been convicted of the same kind of crime, the authorities should inquire into the evidence upon which they were convicted and admit the one and exclude the other. * * *

"This petitioner is an alien seeking admission to this country and it was established before the immigration officials that he had been convicted in England of the offense of criminal libel * * *. The officials went further, examined the report of the proceedings at the trial and determined therefrom that the acts of the petitioner involved moral turpitude.

* * * * * *

"Upon the whole I am compelled to the conclusion that the offense of criminal libel does not in its inherent nature involve moral turpitude and that in classifying it under the immigration laws, it must be designated as one which does not possess that element."

Again, in U. S. ex rel. Zaffarano v. Corsi, 2 Cir., 63 F.2d 757, at page 758, the Court said:

"* * * Proof of the alien's conviction and sentence was made by his admissions at the hearing before the immigrant inspector * * * to the effect that the relator was indicted, tried, and found guilty of 'the crime of assault in the second degree,' and sentenced to state prison for a period of five years. Hence the order of deportation can be supported only if moral turpitude is inherent in second degree assault.

"It has frequently been said that a mere assault does not involve moral turpitude. * * *

" * * * Since the indictment was not before the immigration officials, they knew nothing as to the specific charge upon which the relator was convicted. It may have involved moral turpitude, or it may not. The gravity of the punishment is not controlling * * *; the crime committed must itself involve moral turpitude. * *"

On rehearing, the Court said:

" * * * in United States ex rel. Robinson v. Day, [2 Cir.] 51 F.2d 1022. It was there said that the particular circumstances under which the crime was committed may not be considered, and that, 'when by its definition it does not necessarily involve moral turpitude, the alien cannot be deported because in the particular instance his conduct was immoral.' This language means that neither the immigration officials nor the court reviewing their decision may go outside the record of conviction to determine whether in the particular instance the alien's conduct was immoral. And by the record of conviction we mean the charge (indictment), plea, verdict, and sentence. The evidence upon which the verdict was rendered may not be considered, nor may the guilt of the defendant be contradicted."

In United States ex rel. Teper v. Miller, D. C., 87 F.Supp. 285, at page 287, the Court said:

"Once the fact of the conviction has been established, neither the immigration officials nor the court reviewing their decision may go outside the record of conviction to determine whether in the particular instance the alien's conduct was immoral, nor can they consider the circumstances under which the crime was in fact committed. * * *

"The Court cannot go outside of the record of conviction, and by the record of conviction the courts have indicated is meant the charge (indictment), plea, verdict, and sentence. * * * However, the charge, plea, verdict and sentence are the limit of the record which the immigration officials or the court may consider."

In the Miller case the alien had been convicted of stealing a fur, for which he was fined five pounds and ordered to pay L5-10-0 cost, or one month imprisonment. The Court held that the amount of the theft was immaterial and that petit larceny as well as grand larceny involves moral turpitude.

In United States ex rel. Mongiovi v. Karnuth, D. C., 30 F.2d 825, the alien pleaded guilty to an indictment for manslaughter, second degree. The immigration authorities asserted that the crime involved moral turpitude. The Court said:

"It is now contended * * * that manslaughter in the second degree is not a crime involving moral turpitude, * * *. Moral turpitude is defined as 'an act of baseness, vileness, or depravity in the private and social duties which a man owes to his fellow men or to society.' The intentional slaying of a human being, even though committed without malice, and manslaughter in the first degree, which apparently includes intent and willfulness, would therefore be offenses involving moral turpitude.

"This court is without power to examine into the evidence upon which the conviction or the relator's plea of guilty of manslaughter in the second degree was based * * *.

* * * * * *

"The Solicitor of the Department of Justice, not long since, in a definition of crimes involving moral turpitude for the information of immigration officers, specified a number of offenses which, in his judgment, involved moral turpitude, and excepted offenses which were 'the outcome merely of natural passion, of animal spirits, of infirmity of temper, of weakness of character, or of mistaken principles, unaccompanied by a vicious motive or corrupt mind.' Although this general summary is vague and indefinite, yet I think that

the commission of manslaughter in the second degree is 'unaccompanied by a vicious motive or corrupt mind.' "

In the complaint at bar plaintiff alleges that he has resided continuously in this country from November 26, 1938, to the present time and, therefore, under the provisions of the Immigration Act of February 5, 1917, Section 19(c), as amended, Title 8 U.S.C.A. § 155, he is entitled to have his deportation suspended. He further alleges that his application for suspension of deportation has been arbitrarily, unjustly and unfairly denied.

■ From the authorities cited above it is evident that this court cannot go outside the record of conviction in determining whether or not the crime for which petitioner was found guilty involves moral turpitude; the courts have indicated that by a record of conviction is meant "the charge (indictment), plea, verdict, and sentence." Hence, in determining the question whether or not the crime in this case is one involving moral turpitude, it is impossible for the court to go beyond or behind the indictment, plea, verdict and sentence.

The plaintiff herein, when tried in Spain, was not tried before a jury. He was tried before a court without a jury, and as a consequence the judgment as rendered in the case also contains a statement of the court's findings. In the findings it is disclosed that Vidal y Planas contended that the acts committed by him constituted at most a crime of homicide by imprudence, "without the concurrence of modifying (mitigating) circumstances," and the penalty therefor should be a minimum detention of correctional imprisonment. The court specifically found as follows:

"* * * since the refusal of the murdered man to return to the accused the manuscript which the former had given him and insistently claimed of him in order thus to put an end to a collaboration which he regretted, and the influence exerted over his state of mind by the immediate knowledge of the statements being spread by the murdered man in defamation of his reputation and fame are both stimu-lants which, judged separately and together, it must be admitted, would be sufficiently efficacious to produce in the accused the blind rage of which the Law speaks as attenuating the responsibility of the agent, by virtue whereof, and in accordance with the precept contained in the second rule of Article 82 of the cited text, it is fitting to impose the minimum penalty indicated by Law for the crime which was committed."

And the sentence was as follows:

"We Decree: that we must and do condemn the accused, Alfonso Vidal y Planas, as author of a crime of homicide, with a mitigating circumstance, * * *."

In United States v. Uhl, supra, 203 F. at page 154 the Court said:

" 'Moral turpitude' is a vague term. Its meaning depends to some extent upon the state of public morals. A definition sufficiently accurate for this case, however, is this:

" 'An act of baseness, vileness, or depravity, in the private and social duties which a man owes to his fellow man or to society.' * * *"

The foregoing definition has been followed by other courts, and in the case at bar it does not appear from the judgment rendered by the court in Spain that the act in question was one of "baseness, vileness, or depravity, in the private and social duties which a man owes to his fellow man or to society."

Vidal y Planas says that he was defending himself from assault by de Olmet. The court in Spain found that the knowledge he had of the acts being done by the deceased was a stimulus which would be sufficient to produce in the accused a blind rage.

■ The Solicitor of the Department of Justice, in a definition of crimes involving moral turpitude for the information of immigration officers, specified a number of offenses which in his judgment involved moral turpitude, and excepted offenses which were "the outcome merely of natural passion, of animal spirits, of infirmity of temper, of weakness of character, or of mistaken principles, unaccompanied by a

390

vicious motive or corrupt mind." Consequently, this Court must hold that the crime committed by the plaintiff herein was "unaccompanied by a vicious motive or corrupt mind" and so did not involve moral turpitude.

Inasmuch as it is admitted that Vidal y Planas is a deportable person who remained in the United States as a visitor longer than permitted by his entry documents, it is not possible for this Court to restrain the Commissioner of Immigration from deporting plaintiff upon that ground. However, we are of the opinion that the Attorney General should give some consideration to the suspension of deportation proceedings.

If we understand the matter clearly, the Attorney General has held that because the crime committed by plaintiff herein was one involving moral turpitude, he was not authorized to give any consideration to the suspension of deportation proceedings. Inasmuch as this Court holds that the crime in question was not one involving moral turpitude, it would seem that the Attorney General may now use the discretion as provided in Title 8 U.S.C.A. § 155.

Findings of Fact and Conclusions of Law in conformity herewith are to be prepared by counsel for plaintiff and presented to the Court by April 21, 1952.