MATTER OF S—

In DEPORTATION Proceedings

A-10654545

*Decided by Board November 1, 1961*

**Crime involving moral turpitude—Homicide—Article 153 of the Penal Code of Peru.**

A conviction under Article 153 of the Penal Code of Peru for killing another under the influence of violent emotion which circumstances may render excusable is equivalent to conviction in the United States for voluntary manslaughter and is a crime involving moral turpitude.

CHARGES:

Order Act of 1952—Section 241(a)(1) [8 U.S.C. 1251(a)(1)]—Excludable at entry under 8 U.S.C. 1182(a)(9)—Convicted of crime (homicide).

Lodged: Act of 1952—Section 241(a)(1) [8 U.S.C. 1251(a)(1)]—Excludable at entry under 8 U.S.C. 1182(a)(19)—Visa procured by fraud or misrepresentation.

**BEFORE THE BOARD**

**DISCUSSION:** This case is before us on appeal from a decision of a special inquiry officer granting voluntary departure and directing that the respondent be deported if he fails to depart voluntarily. For the reasons hereinafter stated, the appeal will be dismissed.

The respondent is a 37-year-old married male, native and citizen of Mexico, who last entered the United States on or about January 17, 1960, as a returning resident. He was admitted for permanent residence on May 16, 1956. On June 20, 1952, he was convicted in Peru of homicide, the crime having been committed on November 11, 1950. He was sentenced to imprisonment for 3 years but was given credit for the time he had been incarcerated. The period of imprisonment was from November 1950 until about November 1953. The special inquiry officer found that the respondent withheld the facts of his conviction and imprisonment from the American consular officer when he procured his immigrant visa on January 20, 1956. The only issue involved is whether the respondent is deportable on the two charges mentioned above.

We have carefully reviewed the entire record. The conviction record (Exh. 2) indicates that the circumstances surrounding the

homicide were as follows. The respondent had traveled to Peru early in November 1950 on a business trip. On the night of November 11, 1950, he asked a taxicab driver to take him to a place where he would be able to dance. He was taken to a house of prostitution and danced with one of the prostitutes. Later they had sexual intercourse and she requested a sum of money. An argument took place during which she scratched him on the back of the neck and he seized her by the throat with both hands and threw her on the bed, the strangulation causing her death. In pronouncing judgment, the court said that the respondent did not have the intention of killing this woman; that he was not, however, proceeding in his legitimate defense; that he was intoxicated; and that he "made disproportionate use of masculine strength * * *."

The English translation of Exhibit 2 contains the statement, "* * * the substance of the crime in this trial is found comprehended within the provisions of Articles 150, 100, 90 and 153 of the Penal Code." However, the original Spanish document indicates that the first Article referred to was 51 rather than 150. Articles 51, 90 and 100 specify the persons who are to be deemed responsible for the commission of crimes and set forth certain matters which are to be considered in determining the punishment. The special inquiry officer found that the conviction occurred under Article 153 of the Penal Code of Peru, and counsel concedes that this is the statutory provision involved. Hence, the erroneous reference to Article 150 is not material.

According to the English translation of the pertinent part of Article 153, it relates to "killing another under the influence of a violent emotion which circumstances may render excusable." Where an alien has been convicted of an offense in a foreign country, the question of whether the crime involves moral turpitude must be determined in accordance with standards prevailing in the United States. *Mercer* v. *Lence*, 96 F.2d 122 (C.C.A. 10, 1938), cert. den. 305 U.S. 611. In construing the immigration laws, it has been consistently held that voluntary manslaughter involves moral turpitude and that involuntary manslaughter does not. *Matter of S—*, 2—559, 570 (A.G., 1947). There is no disagreement between counsel and the Service as to any of these matters.

With reference to the special inquiry officer's statement that Article 153 of the Penal Code of Peru is sufficiently broad to include crimes that involve moral turpitude and those which do not, counsel contends that this precludes a conclusion that the respondent was convicted of a crime involving moral turpitude in view of our statement in *Matter of B—*, 4—493, 496 (1951), that the definition of a crime must be taken at its minimum. We disapprove the special inquiry officer's statement since we perceive nothing in the language of

654377—63——33

Article 153 which would indicate that it is a broad statutory provision or that it could include a crime not involving moral turpitude.

Counsel asserts that the special inquiry officer took into account the circumstances surrounding the homicide and he contends that this was error. He further urges that, even if the circumstances are considered, they should lead to the conclusion that the crime does not involve moral turpitude. Actually, the special inquiry officer considered only statements and findings which appear in the judgment of the court (Exh. 2), and we believe this was permissible under our decisions in *Matter of K—*, 4—490 (1951), and *Matter of M—*, 9—132 (1960), where the convictions also occurred in foreign countries. In the former case, we held that it was proper to consider any statement of record made by the court in sentencing a defendant. In the latter, we said that we may look beyond the foreign statute to consider such facts as may appear from the record of conviction or from other sections of the foreign criminal code to reach an independent conclusion as to whether the offense is one which under our law would involve moral turpitude.

Although we believe that the statements made by the court in pronouncing judgment may properly be considered, we will base our decision in this case upon the language of the statute under which the respondent was convicted. Before discussing the statutory language, however, we will comment on counsel's contention that the circumstances of the homicide require a conclusion that the crime does not involve moral turpitude. Counsel contends that the special inquiry officer decided the case on a theory which would mean that a playful but intentional push, resulting in death, would constitute voluntary manslaughter. If the respondent had merely pushed the woman from him and she had died as a result of falling and striking her head, the circumstances would hardly suggest moral turpitude. On the other hand, when the respondent grasped the prostitute by the throat with both hands, it would seem that a court might well have been warranted in finding that the respondent intended to kill the woman.

We are aware, of course, that the court specifically found that the respondent did not have the intention of killing this woman. Counsel relies on this finding and he contends that the distinction between voluntary manslaughter and involuntary manslaughter is that an essential element of the former is the intent to kill which is not present in the latter. In his brief, counsel quoted the following sentence appearing in 26 Am. Jur., Homicide § 18: "The mental state that characterizes the crime of involuntary manslaughter is the absence of intention to cause death, either actual or reasonably to be implied from the homicidal act." Although an intention to cause

498

death would preclude the possibility of classifying the crime as involuntary manslaughter, this does not mean that the intention to cause death is a necessary element of voluntary manslaughter. In 26 Am. Jur., Homicide § 19, appears the statement: "The offense [voluntary manslaughter] is one involving moral turpitude, but whether the slayer must have been actuated by a design or purpose to kill is a question on which the authorities differ. According to the expressions in some cases, voluntary manslaughter necessarily involves the intention to deprive another of life, whereas other opinions state that no design to kill is necessary; and authority may be found in support of the position that the homicidal blow must have been struck without intention to encompass death."

In connection with the latter statement above, that some authorities hold that voluntary manslaughter requires the *absence* of an intention to cause death, this is the situation under the New York statute which refers to manslaughter in the first degree as one "committed without a design to effect death." In discussing this statutory provision in *United States ex rel. Sollano v. Doak*, 5 F. Supp. 561, 565 (N.D. N.Y., 1933), aff'd 68 F.2d 1019, the court said: "The only intent lacking in manslaughter in the first degree is intent to effect death. Had there been intent to kill, it would not have been manslaughter in the first degree but murder."

In *Bishop v. United States*, 107 F.2d 297, 302 (C.A. D.C., 1939), the court said: "The crime of manslaughter occurs when the killing is done in 'heat of passion' engendered by adequate provocation. To constitute this crime it is not required to show that the killing was done purposely, deliberately, premeditatedly, or with malice aforethought. It is only necessary to show that the killing was committed in 'heat of passion' upon sufficient provocation." The fact that it is not necessary to show that the killing was done purposely indicates that the intent to kill is not a required element of manslaughter.

In view of the foregoing, we do not believe that the fact that the court said that the respondent did not intend to kill the woman shows that the offense was involuntary manslaughter rather than voluntary manslaughter. We need not discuss the cases cited by counsel for the proposition that the determination of whether a crime involves moral turpitude is to be made on the basis of the statutory provision rather than on the circumstances of the case since we have indicated above that our decision will be based on the language of Article 153 of the Penal Code of Peru. For the same reason, we pass by the cases in which the courts or this Board looked beyond the statute to the record of conviction. Similarly, the district court decision in *United States ex. rel. Mongiovi v. Karnuth*, 30 F.2d 825 (W.D., N.Y., 1929), and those judicial and administrative decisions cited by counsel and the Service, which were based on the language of particular

statutory provisions of various States, are not especially helpful in the respondent's case in which consideration must be given to a provision of the laws of a foreign country.

In *Vidal y Planas* v. *Landon*, 104 F. Supp. 384 (S.D. Cal., 1952), the plaintiff had been convicted of homicide "with a mitigating circumstance." The conviction occurred in Spain in 1924 and the plaintiff was imprisoned until 1928 when he was pardoned. A man named de Olmet, who was larger and stronger than the plaintiff, attempted to choke him and the plaintiff, in order to protect himself, shot de Olmet without intending to kill him. The court held that the crime did not involve moral turpitude. The Service cited this case as authority for the proposition that consideration may be given to the findings of the court as stated in the judgment rendered. It was also cited by counsel who contended that the respondent's offense should be held not to involve moral turpitude because there was not even the use of a dangerous weapon. The case involved unusual circumstances, and the court specifically stated that the immigation authorities had recognized that this was an exceptional case. The opinion does not set forth the Spanish statutory provision under which the conviction occurred and, since the law of a different country is involved here, we do not consider the decision in the *Vidal y Planas* case to be controlling as to this respondent.

Another case involving a conviction for homicide in a foreign country is *Pillisz* v. *Smith*, 46 F.2d 769 (C.C.A. 7, 1931). There, the alien had been convicted of manslaughter in Hungary where degrees of manslaughter are apparently not recognized. The court found that the crime involved moral turpitude and said: "We know of no greater moral law than that which discountenances the taking of human life without excuse, and one who violates it is to that extent morally depraved."

We turn now to a consideration of the provisions of the Penal Code of Peru. Exhibit 3 contains pertinent parts of the Spanish text and an English translation. Article 156 provides that a person who, through negligence, shall cause anyone's death, shall be reprimanded by imprisonment not to exceed 2 years. This appears to be similar to the offense usually characterized as involuntary manslaughter in the United States. Article 153, which is involved in this respondent's case, provides: "A penitentiary term not to exceed 10 years, or imprisonment of no less than one year nor more than 5 years, shall be imposed on anyone killing another under the influence of a violent emotion which circumstances may render excusable."

As we have indicated above, the question of whether a foreign crime involves moral turpitude is to be determined in accordance with standards prevailing in the United States. It appears appro-

priate, therefore, to consider the definitions of murder and manslaughter as set forth in 18 U.S.C. 1111 and 1112, even though these statutory provisions are limited to crimes committed within the special maritime and territorial jurisdiction of the United States. Section 1111 defines murder as "the unlawful killing of a human being with malice aforethought." It further provides that murder in the first degree is one perpetrated by poison or any other kind of willful, deliberate, malicious, and premeditated killing, or committed in the perpetration of any arson, rape, burglary, or robbery. Any other murder is murder in the second degree. 18 U.S.C. 1112 provides, in part, as follows:

(a) Manslaughter is the unlawful killing of a human being without malice. It is of two kinds:

Voluntary—Upon a sudden quarrel or heat of passion.

Involuntary—In the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death.

It will be seen from the foregoing that murder involves the element of malice and that manslaughter does not. However, neither voluntary nor involuntary manslaughter contains any requirement that there must have been the intent to kill. As a matter of fact, where the killing occurred in the perpetration of arson or the other crimes mentioned in section 1111, a person is guilty of first degree murder even though there was no intent to kill.

We will now compare Article 153 of the Penal Code of Peru with the definition of voluntary manslaughter in 18 U.S.C. 1112. The "sudden quarrel or heat of passion" mentioned in 18 U.S.C. 1112 is entirely similar to "influence of a violent emotion" in Article 153. The additional requirement, as indicated in *Bishop* v. *United States*, *supra*, that the "heat of passion" must have been produced by adequate provocation is equivalent to the requirement of Article 153 that the violent emotion must be excusable because of the circumstances. In view of the foregoing, it is our considered opinion that a conviction under Article 153 of the Penal Code of Peru is for the crime known as voluntary manslaughter in the United States and that the crime involves moral turpitude. Accordingly, we hold that the first charge is sustained.

The second charge in this case is that the respondent is deportable because he was excludable at the time of entry under 8 U.S.C. 1182(a)(19) due to having procured his 1956 immigrant visa by fraud or misrepresentation. In connection with this charge, we have considered the respondent's case in the light of the Attorney General's decision of October 2, 1961, in *Matter of S— and B—C—*, 9—436, setting forth the rules to be followed in determining whether a misrepresentation is material. Counsel argued that the offense did

not involve moral turpitude and that the respondent's concealment of the arrest was not material. Since we have concluded that the crime does involve moral turpitude, the misrepresentation clearly related to a material fact. The record shows that the misrepresentation was made willfully, and we hold that the second charge is sustained.

Counsel also contended that the respondent is within the purview of section 7 of the Act of September 11, 1957 [8 U.S.C. 1251a; 71 Stat. 640] relating to aliens who had procured visas by fraud or misrepresentation and who were the spouses or parents of United States citizens. The respondent has a citizen wife and citizen children. This statutory provision was repealed by section 24(a) of the Act of September 26, 1961 [Public Law 87–301; 75 Stat. 650], but was reenacted in section 16 of that Act in modified form. However, neither the original nor the amended statutory provision would be of assistance to this respondent because each required that the alien must have been otherwise admissible at the time of entry, whereas this respondent was then excludable on the additional ground, under 8 U.S.C. 1182(a)(9), that he had been convicted of a crime involving moral turpitude.

For the reasons discussed above, the appeal will be dismissed. In his decision, the special inquiry officer adopted the six factual allegations contained in the order to show cause and a seventh allegation (Exh. 4) lodged at the hearing. He also made additional findings of fact numbered 8 to 10, inclusive, and adopted as his conclusions of law the deportation charges set forth in Exhibits 1 and 4. We adopt the findings of fact and conclusions of law of the special inquiry officer except that finding of fact numbered (3), which is to the effect that the respondent "last entered the United States" on or about May 16, 1956, is amended by deleting the word "last," and immediately preceding this finding there is inserted an additional finding (2–A) reading as follows: "The respondent last entered the United States at San Ysidro, California, on or about January 17, 1960, as a returning resident alien".

ORDER: It is ordered that the appeal be and the same is hereby dismissed.