[No. 32776.    Department One.    September 21, 1954.]

DOROTHY RANDEL ANDERSON, *Appellant*, v. HARRY L. PET-
RIDGE, *as Executor, Respondent.*[1]

[1]Reported in 274 P. (2d) 352.

*Kellogg, Reaugh, Hart & Johnson* and *Samuel C. Rutherford*, for appellant.

*Miracle, Treadwell & Pruzan*, for respondent.

GRADY, C. J.—Two actions were instituted by appellant based upon rejected claims filed in the Albert C. Petridge estate. One claim was for the recovery of certain articles of personal property which appellant asserted she had either loaned to or put in the possession of the decedent for the purpose of sale, or in the alternative to recover their value. The other claim was for compensation claimed to be owing from decedent to appellant for personal services rendered pursuant to an express contract. Actions upon the claims were consolidated for trial and on this appeal. The court denied recovery on both claims. The decedent will be referred to as the respondent the same as if he were, living, and where necessary the executor will be referred to as such.

We shall refer to the personal property claim as the first cause of action and to the other claim as the second cause of action. The answer to the complaint on the first cause of action was a general denial. The answer to the complaint on the second cause of action was a general denial, a plea of payment, and an affirmative defense to the effect that the contract referred to in the complaint was void by virtue of a Federal statute. At the trial, the executor advanced the theory that any services appellant may have performed for respondent were in reliance upon a promise of marriage and as an incident to an unorthodox relationship between the parties. The benefit of RCW 5.60.030 was waived by the executor.

At the close of the trial, the trial judge took the case under advisement, but did not make any memorandum decision or

any analysis of the evidence. Findings proposed by appellant were rejected. The court made a finding on the first cause of action to the effect that two of the items of personal property consisting of a Bulova wrist watch and two urns had been returned by the executor during the course of the trial, but concluded there was no credible evidence submitted by appellant to prove that the other articles of personal property were ever in the possession of the respondent. On the second cause of action, the court determined as follows:

"That the written document filed as Plaintiff's Exhibit 1 herein was not intended by either the plaintiff or the decedent, ALBERT C. PETRIDGE, to be valid or binding legal instrument, and that any services in the nature of nursing or chauffeuring services that were rendered by plaintiff to decedent were not rendered in reliance upon said document."

This determination does not take into consideration the verbal offers of the respondent and appellant, their acceptances, and the written confirmation of appellant (exhibit 2).

The appellant was a widow of the age of about forty-five years and a resident of Vancouver, B. C. She was possessed of some real and personal property, operated a tea room, and bought and sold real estate; she had given massage treatments to various persons, and while in military service had driven automobiles for army personnel. She was the mother of two adult sons, one of whom died while in the Canadian armed service. Appellant married a man by the name of McKay, who lost his life while in the armed services in Germany. The marriage extended over a period of about four years. Some time after the death of McKay, appellant resumed her former name of Randel, which was the surname of her sons. At the time of the trial, appellant was the wife of one Anderson.

On or about May 13, 1948, appellant stopped at Seattle on her way to the Mayo Clinic, at Rochester, Minnesota. She was a prospective customer for a trailer. Respondent was engaged in the business of buying and selling trailers. Appellant visited the trailer lot operated by respondent to

inquire about the purchase of a trailer; the parties had never met before. On appellant's return from the clinic the latter part of May, she again inspected trailers but made no purchase.

Respondent was of the age of about sixty-seven years and was living separate and apart from his wife; he had been successful in his business and had accumulated a substantial estate. Respondent was afflicted with arthritis and rheumatism, had previously had a stroke, and the circulation in one leg and in his left arm and shoulder was retarded.

About a week after the return visit, respondent went to Vancouver and called upon appellant. Respondent informed appellant of his physical ailments and asked her if she knew of anyone who could help him. Appellant gave respondent a treatment, and he then requested that she give him treatments regularly. Respondent made frequent week-end visits to appellant at Vancouver and received from her massage and sun-lamp treatments, soda-salts baths, and appellant prescribed a special diet for him. The treatments were continued until appellant migrated to Seattle.

On September 4, 1948, appellant wrote and sent the following letter (exhibit 2) to respondent:

"Mr. A. C. Petridge,                          352 W 22 Ave,
2326 — 5th Ave.,                              Vancouver, B. C.
Seattle, Washington, U.S.A.          September 4, 1948.
"Dear Sir,
"Confirming our conversation of this date above,
                         "Re—Treatments
"For the consideration of $50.00 I will give you the treatments so prescribed by Dr. H. Wackenroder and myself. These treatments are to include any four days of each and every week at $50.00 per treatment, as per arrangements. This will include treatments, room and board. Thanking you in advance, I beg to remain,
                         "Yours very truly,
                         "P. Nurse D. M. Randel."

Respondent wrote and sent the following letter (exhibit 1) to appellant:

"Mrs. Dorothy Randel      ..         June 4, 1948
Vancouver, B. C.
"Dear Mrs. Randel:

"Confirming our conversation this date above re. to nursing treatments & chauffeuring. Also all expenses paid by A. C. Petridge for use of your car & services & ect. under the following conditions:

"It is agreed and understood that I, A. C. Petridge of Seattle, Washington will pay you ($50.00) per week on the above basis. Enclosed find $100.00 as deposit and $50.00 per week to be paid in advance.

"In case that this agreement will terminate each party must give a one week notice by letter. A notice of termination. This letter is given in case you sell out or Mr. Petridge is forced to terminate under conditions beyond his control. Hope we can be both contented and mutual with this agreement and thanking you in advance I beg to remain

"Yours truly,<br>"A. C. Petridge

"P. S. This above agreement has know bearing on any monies given you for your personal use or any other transactions in the future.
"Accepted June 7, 1948
"A. C. Petridge"

The letter was back dated to June 4, 1948, to become effective as of such date, or June 7th, as noted at the bottom thereof.

By the month of August 1948, the services rendered by appellant to respondent were of such a satisfactory character and the friendship between them had so ripened, respondent was prompted to and did propose marriage to appellant. The proposal was accepted. Respondent represented to appellant that he was unmarried and that his wife had died of alcoholism. Respondent, finding frequent trips to Vancouver to receive treatments to be tiresome, requested that appellant dispose of her property and business and immigrate to Seattle. Respondent made appellant a gift of two thousand dollars. Appellant moved to Seattle in April, 1949. Appellant sold her property and business in Vancouver, purchased a home in Seattle, and made the necessary preliminary arrangements to apply for United

States citizenship. Appellant made her declaration of intention August 28, 1950, and followed it by attending naturalization school.

After coming to Seattle to reside, appellant continued to perform services under the contract. In the early fall of 1949, appellant learned that respondent was a married man. Prior to this time, she had discovered that he was having an affair with a woman, with reference to which she made remonstrance by letter. Respondent reiterated his affection, his desire that they be married, begged her forgiveness, and requested that she continue to serve him pursuant to the terms of their contract. Even after it became known to appellant that respondent was married, and notwithstanding her expressed desire and intention to terminate their contract and return to Canada, respondent objected and called her attention to the fact that she was not only under contract to serve him, but he had her power of attorney; that they had made mutual wills, and urged she was not in a position to carry out her plan but should continue to serve him. On November 9, 1951, respondent wrote a letter with reference to appellant in which he stated she had been his nurse and driver of his car for the past four years whenever needed by him.

When respondent went to the hospital for amputation of his leg in March, 1952, he informed appellant he would endeavor to have her serve on a night shift. Mrs. Petridge objected to the performance of further services by appellant. Respondent then stated: "After all, you (meaning appellant) are still my nurse and you are on contract. To heck with what they say, I am giving the orders." After the amputation, respondent made request of appellant that she call on him and she did so. No notice of termination of the contract as provided in exhibit 1 was ever given by either party. The record indicates that no services contemplated by the contract were rendered after about December 25, 1951, though appellant at all times was ready, able, and willing to do so.

At various times during the performance of the contract,

appellant delivered the articles of personal property referred to in the first cause of action. Some of the property was loaned to respondent and used by him in his apartment, and some was left with him to be sold for appellant. During the pendency of the action, written requests were made for the production of the personal property, but the executor disclaimed any knowledge thereof. Three items of personal property have not been returned to appellant, nor has any accounting been made therefor. There is ample evidence to support a finding that the value of such property was $1,625.

The legal relationship between respondent and appellant was that of employer and employee. The original contract for services was verbal and became effective about June 4, 1948. The amount of compensation was fixed by respondent in about September, 1948, but was made effective as of June 4, 1948. The documents above quoted constitute the parts of the contract that were in writing and furnish evidence of the verbal service contract. The contract did not require initiative action by appellant in its performance—it required service of appellant if and when respondent so sought and made himself available therefor.

We shall assume for the purposes of this case that soon after appellant and respondent became engaged some of their personal conduct with each other became unconventional and illegal, and that such occurred intermittently for a considerable period of time thereafter. However, such a situation does not preclude recovery by appellant under the contract unless it be made to appear that the contract was made in contemplation of such relationship. *Emmerson v. Botkin,* 26 Okla. 218, 109 Pac. 531, 29 L.R.A. (N.S.) 786, 138 Am. St. Rep. 953 and notes; *Lytle v. Newell,* 24 Ky. Law. Rep. 188, 68 S. W. 118; *Rhodes v. Stone,* 63 Hun 624, 17 N. Y. S. 561; *Feig v. Bank of Italy, etc.,* 14 P. (2d) (Cal. App.) 612; *Hill v. Westbrook's Estate,* 95 Cal. App. (2d) 599, 213 P. (2d) 727.

In the cases where recovery has been denied it has appeared that the plaintiff sought recovery on the theory of implied contract to pay for services rendered, but the dif-

ficulty encountered was that the consideration being the illicit relationship was illegal and no promise to pay could be implied.

The most helpful test used in this class of cases is the presence or absence of an express contract of employment and an agreement to pay therefor. The theory is if there is an express contract based upon a legal consideration then it is so highly improbable that there was any connection between the contract and the illegal relationship that the trier of fact can readily find that the contract was not made in contemplation of such relationship.

In the case before us there was an express contract for the rendition of services made long before any illegal relationship between appellant and respondent commenced. The contract was not made in contemplation of such relationship nor did subsequent illicit conduct furnish any part of the consideration therefor. The fact that there may have been some subsequent unconventional conduct separate from the express contract for services cannot affect the validity of the contract or the right to recover thereon. (Cases cited above.)

All that we have just said applies to the claim made that the services performed by appellant were rendered pursuant to the promise of respondent to marry her and that such promise was a part of the consideration therefor. We find from a review of the record that the abortive promise to marry had nothing to do with the consideration of the contract for services and its performance by appellant was not referable thereto. Respondent relies upon one of the paragraphs of the complaint of appellant in a suit brought by her for breach of promise of marriage and seduction to support the claim that the consideration for the service contract was illegal. The action was abated by the death of respondent. The allegations may properly be treated as admissions, but when construed along with the direct and circumstantial evidence in the record and weighed therewith, we are convinced that the preponderance of the evi-

dence makes the doctrine of the cited cases applicable to the second cause of action.

■ We find no merit to the defense of illegality based upon § 141, title 8, Federal Code Annotated. The statute makes invalid a contract with an alien to perform labor or services in the United States previous to migration into the latter country. The purpose of the statute was discussed in the leading case on the subject of *Church of the Holy Trinity v. United States*, 143 U. S. 457, 36 L. Ed. 226, 12 S. Ct. 511. In that case, like the one before us, it was sought to apply the broad language of the statute somewhat literally, but the court declined so to do. The court made reference to the evil the statute was aimed to correct. The evil was the practice of large capitalists in this country to bring in an ignorant and servile class of laborers to work at low wages and thus compete with our better-paid laborers and have a tendency to break down the labor market.

The contract between appellant and respondent, when made, contemplated the performance of services at Vancouver, B. C. It was a valid contract when made; there was a valid performance under the contract in the foreign country. Appellant in good faith migrated to the state of Washington with the intention of becoming a citizen of the United States; she so declared in due course of time and made the usual preparation for naturalization. We are of the opinion that the statute does not apply to appellant and respondent or their contract now before the court. This makes it unnecessary to consider § 136(h) of the act cited by appellant in her reply brief (8 U. S. C. A., § 141, 23 Stat. 332).

Appellant became entitled under her contract to payment for services between June 4, 1948, and December 25, 1951, at the rate of $50 per week, or a total of $9,250. Appellant received from respondent, which she has recognized as payment on the contract, the sum of $3,550, leaving a balance for which her claim against the estate should be allowed in the sum of $5,700. On the first cause of action, appellant is entitled to have her claim allowed in the sum of $1,625.

The judgment is reversed and the cause remanded for

the entry of an order allowing appellant's claims against the estate of respondent in the total sum of $7,325. The claims being unliquidated, interest can accrue only from the date of entry of judgment. The appellant will recover costs on appeal.

MALLERY, HAMLEY, and FINLEY, JJ., concur.

OLSON, J. (dissenting)—In my opinion, the evidence supports the findings of the trial court quoted by the majority. As they state, the agreement to marry was reached in August, 1948. This preceded the making of the alleged contract for services under which recovery is sought. The fact that the letter of acceptance from Mr. Petridge was dated in June, does not change the time the contract was made.

In addition to the alleged contract for services, the evidence discloses many documents exchanged between these parties. Some of these appellant frankly described as "phony" or "false," including a note and chattel mortgage for fifty-seven hundred dollars, and a note for two thousand dollars. The latter was dated 1937, and purportedly signed by one McKay, a former husband of appellant, to the order of Mr. Petridge. The maker of the note died long before Petridge met appellant, and she testified that it was given for purposes of the payee's income tax.

A later note signed by appellant to the order of Mr. Petridge, payable on demand in the sum of two thousand dollars, she said was given to him for his income tax purposes. She claims this had no connection with an asserted gift to her from him in the same amount.

These facts, together with others which might be related, such as his financial aid to her in the acquisition and equipment of a home in Seattle, his marital status during the conquest, the allegations in her complaint in her breach of promise and seduction action against him, that she gave him care and attention in reliance upon an agreement to marry, indicate that the personal relationship of the parties and the successful "migration" of appellant to the United States, necessary or desirable for its continuance, were their pri-

mary concern, rather than any "personal services" for which she now seeks payment.

Their financial arrangements were so devious that no accurate determination of a balance due appellant can be made. Her claim for the items of personal property also is indefinite. I cannot agree that she sustained the burden of proof which is upon her in this action, and would affirm the judgment.